UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
AMERICAN POSTAL WORKERS UNION,    )
AFL-CIO,                                         )
                                                )
            Plaintiff,                          )
                                                )
      v.                                         )      Civil No. 07-0178 (RMC)
                                                )
UNITED STATES POSTAL SERVICE,         )
                                                )
            Defendant.                       )
_____)

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Rule 56 of the Federal Rules of Civil Procedure, plaintiff American Postal Workers Union, AFL-CIO ("Union"), moves for summary judgment.  The United States Postal Service ("Postal Service") has not complied with Arbitrator Harry R. Gudenberg's clear directive that the Postal Service pay back pay to employee Christopher Broderick from January 15, 2005, until the award was finally implemented on March 12, 2007.  The Postal Service did not take action to vacate the award and its non-compliance is not excused.

The Court should therefore enforce Arbitrator Gudenberg's award.  Attached hereto are a statement of material facts not in dispute; a combined opposition to the Postal Service's motion to dismiss and memorandum of points and authorities in support of the Union's motion; the attached declaration of Peter Coradi and attached exhibits; and a proposed order.

Date: May 25, 2007                 Respectfully submitted,

                                   O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                   By:_____/s/: Brenda C. Zwack_____
                                      Brenda C. Zwack (DC Bar # 482673)
                                      1300 L Street, N.W., Suite 1200
                                      Washington, DC  20005
                                       (202) 898-1707  /  FAX (202) 682-9276

                                   *Attorneys for the American Postal Workers Union,
                                   AFL-CIO*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
AMERICAN POSTAL WORKERS UNION,    )
AFL-CIO,                                             )
                                                    )
              Plaintiff,                            )
                                                    )
       v.                                           )    Civil No. 07-0178 (RMC)
                                                    )
UNITED STATES POSTAL SERVICE,              )
                                                    )
              Defendant.                           )
_____  )

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

In accordance with Local Rule 7.1 (h), Plaintiff sets forth the following statement of

material facts as to which there is no genuine issue:

1.       Plaintiff American Postal Workers Union, AFL-CIO ("Union") and defendant

United States Postal Service ("Postal Service") were party to a national collective bargaining

agreement in effect from November 21, 2000, through November 20, 2006, ("the National

Agreement") that set forth the terms and conditions of employment of  employees in bargaining

units represented by the Union at various Postal Service facilities.  Declaration of Peter Coradi

attached hereto as Attachment 1 ("Coradi Dec.") at ¶ 3. The National Agreement is negotiated by

the parties at the national level.  Id.

2.       Article 15 of the National Agreement establishes a grievance procedure leading to

final and binding arbitration before a neutral arbitrator in the event the parties are unable to

otherwise resolve disputes under the National Agreement through the grievance procedure.

Coradi Dec. at ¶ 3 and Article 15 of the National Agreement attached thereto as Ex. A at p. 103.

3.       In December of 2004, the Postal Service terminated Christopher Broderick from his position as a full time window clerk at the Smithtown, New York Post Office, effective January 15, 2005.  Coradi Dec. at ¶ 4; Declaration of Andrew Moresco attached as Ex. 1 to Def.'s Motion to Dismiss ("Moresco Dec.") at ¶ 3.

4.       The Union timely grieved Broderick's termination in accordance with Article 15 of the National Agreement.  Coradi Dec. at ¶ 4.  The parties were unable to resolve the grievance through the various steps of the grievance procedure and the Union appealed the matter to arbitration.  Id.

5.       On June 8, 2005, and August 26, 2005, the parties appeared for an arbitration hearing before Arbitrator Harry R. Gudenberg.  Id. at ¶ 5; Ex. B attached thereto at p. 1. Following the hearing, on September 12, 2005, Arbitrator Gudenberg issued an award sustaining the grievance:

> AWARD: For the reasons detailed in the full decision, the grievant is to be reinstated with back pay, less any other compensation received, from January 15, through the implementation of this decision.  However, he is not to be reinstated as a window clerk.  The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or such other position that does not handle cash transactions as they may determine.
>
> Jurisdiction will be retained in the event the parties request assistance in the implementation of this decision.

Ex. B to Coradi Dec. (hereinafter referred to as "Gudenberg I") at p. 1; Moresco Dec. at ¶¶ 2-3 and Ex. A attached thereto.

6.       On October 20, 2005, the Postal Service, without agreement by the Union, placed Broderick in a part-time flexible position on the night shift at the Bethpage, New York facility.

Coradi Dec. at ¶ 7; Moresco Dec. at ¶ 3.

7.      Part time flexible employees are not guaranteed any more than four work hours per week.  Coradi Dec. at ¶ 7.

8.      As Broderick had formerly held a full time regular position on the day shift at the Smithtown, New York Post Office, the Union did not consider this offer to be in compliance with Gudenberg's September 12, 2005, award.  Id.

9.      Broderick did not accept the Postal Service's offer to return to work under these circumstances.  Id.; Morseco Dec. at ¶ 4.

10.      In response to the Postal Service's offer, the Union wrote to Arbitrator Gudenberg on October 25, 2005, to explain that the Union did not consider this offer of part time employment at a different facility, on a different shift, to be in compliance with the award. Coradi Dec. at ¶ 8 and Ex. C attached thereto at pp. 2-3.

11.      Following receipt of the Union's correspondence, Arbitrator Gudenberg conducted a conference call with the parties and stressed that they were to work jointly to find an acceptable position for Broderick.  Id.

12.      The Postal Service still refused to offer a full time position to Broderick that would have been equivalent to his former position.  Id.

13.      On January 12, 2006, the Union again wrote to Arbitrator Gudenberg and informed him that the Postal Service continued to offer only part time positions to Broderick.  Id at ¶ 10 and Ex. C attached thereto at pp. 3-4.

14.      Following the Union's January 2006 correspondence to the Arbitrator, the Union requested a second hearing before Arbitrator Gudenberg to resolve the parties lingering disputes

about implementation of the September 12, 2005, award. Coradi Dec. at ¶ 11 and Ex. C attached thereto at pp. 3-4.

15.    Arbitrator Gudenberg set a second hearing date for Monday, July 17, 2006. Id.

16.    Meanwhile, on Sunday, July 16, 2007, the Postal Service took the highly unusual step of issuing a notice of termination on a Sunday. Coradi Dec. at ¶ 12. The notice, effective immediately, was directed to Broderick and charged him with being absent without leave ever since he failed to accept the part time position that the Postal Service had offered him on October 20, 2005. Id.; Moresco Dec. at ¶ 4.

17.    The Union timely grieved this second termination by the Postal Service. Coradi Dec. at ¶ 12; Moresco Dec. at ¶ 7.

18.    Following the second day of hearing before Arbitrator Gudenberg on July 17, 2006, the Arbitrator issued a second supplementary decision and award that provided as follows:

> AWARD: The grievant is to be returned to work at the Smithtown postal facility as a distribution clerk and is entitled to back pay and seniority credit for the reasons more fully discussed in the complete decision.

Coradi Dec. at ¶ 13 and Ex. C attached thereto (hereinafter "Gudenberg II") at p. 1.

19.    In this second decision, Arbitrator Gudenberg quoted extensively from his September 12, 2005, decision. Gudenberg II at pp. 2, 5. Specifically, he restated his earlier award providing that the Postal Service was to pay Broderick "back pay, less any other compensation received, from January 15, through the implementation of this decision." Id.

20.    Following this second supplementary award, the Postal Service still did not comply with Arbitrator Gudenberg's awards. Coradi Dec. at ¶ 14; Moresco Dec. at ¶ 6. According to the Postal Service "because Mr. Broderick had been removed from employment

4

effective July 16, 2006, Mr. Gudenberg's supplemental award could not be implemented."
Def.'s Mem. in Supp. of Mot. to Dismiss at p. 3.  Thus, the Postal Service still did not return
Broderick to a full time position at the Smithtown facility.  Coradi Dec. at ¶ 14.

21.    As of January 26, 2007, the date that the Union filed this lawsuit, the Postal
Service had not returned Broderick to work as a full time distribution clerk at the Smithtown Post
Office.  Coradi Dec. at ¶ 15; Moresco Dec. at ¶ 9.

22.    On November 3, 2006, the Postal Service had paid Broderick a certain amount of
back pay for the period from January 15, 2005, until October 20, 2005, the date that the Postal
Service offered him a part time position at the Bethpage facility.  Id. at ¶ 15; Moresco Dec. at ¶
10.

23.    The Union did not then and does not now consider this partial payment of back
pay to be sufficient to comply with Arbitrator Gudenberg's awards because those awards require
the Postal Service to pay back pay to Broderick from January 15, 2005, until such time as it
reinstates him as a full time distribution clerk at the Smithtown Post Office.  Coradi Dec. at ¶ 15.

24.    On February 8 and 23, 2007, the parties appeared before a new arbitrator,
Arbitrator Sarah Cannon Holden, to arbitrate the grievance the Union filed over Broderick's July
16, 2006, termination for failing to report to the part time position at the Bethpage facility.  Id. at
¶ 16 and Ex. D attached thereto (hereinafter "Holden Award") at 1; Moresco Dec. at ¶ 7.

25.    On February 26, 2007, Arbitrator Holden issued an award sustaining the grievance
and providing:

> MERITS: I find that the Postal Service did not have just cause to issue the
> June 13, 2006 Notice of Removal to Christopher Broderick.  The grievant
> shall be reinstated in accordance with the findings of the July 24, 2006

Gudenberg Supplementary Award.  There shall be no award of back pay associated with the instant grievance.

<u>Id</u>.

26.     On March 12, 2007, the Postal Service finally restored Broderick to a full time position as a distribution clerk at the Smithtown Post Office.  Coradi Dec. at ¶ 18; Moresco Dec. at ¶ 9.

27.     The Postal Service now claims that it has done all that it needs to do to comply with the Gudenberg awards.  Def.'s Mem. in Supp. of Mot. to Dismiss at p. 1.


Date: May 25, 2007                    Respectfully submitted,

                                              O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                              By: _____/s/: Brenda C. Zwack_____
                                                Brenda C. Zwack (DC Bar # 482673)
                                                1300 L Street, N.W., Suite 1200
                                                Washington, DC  20005
                                                (202) 898-1707  /  FAX (202) 682-9276

                                              *Attorneys for the American Postal Workers Union, AFL-CIO*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN POSTAL WORKERS UNION,          )
AFL-CIO,                                )
                                        )
                Plaintiff,              )
                                        )
        v.                              )    Civil No. 07-0178 (RMC)
                                        )
UNITED STATES POSTAL SERVICE,           )
                                        )
                Defendant.              )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

        Comes now plaintiff American Postal Workers**,** AFL-CIO ("Union") in opposition to

defendant United States Postal Service's ("Postal Service") motion to dismiss the complaint in

accordance with Rule 12 (b)(1) of the Federal Rules of Civil Procedure.  The Union further

respectfully moves this Court for summary judgment in accordance with Rule 56 of the Federal

Rules of Civil Procedure.

        On January 26, 2007, the Union filed a complaint initiating the instant lawsuit.  In its

complaint, the Union requested that the Court enforce the September 2005 arbitration award and

subsequent supplemental award of Arbitrator Harry R. Gudenberg.  Both awards were issued in

accordance with the parties collective bargaining agreement and both awards are final and

binding.  The Postal Service has moved to dismiss the Union's claim on the ground that the

Court lacks subject matter jurisdiction because intervening events have mooted the dispute.

Specifically, the Postal Service claims that a subsequent award by a different arbitrator operated

to excuse their full compliance with the Gudenberg awards. The Postal Service maintains that, in light of this new arbitration award, the steps it has taken in partial compliance with the earlier awards now constitute the maximum relief the Union is entitled to.

As the Union will demonstrate, this secondary award did not and could not excuse the Postal Service from its obligation to fully comply with the Gudenberg awards. Because the Postal Service has not fully complied with the Gudenberg awards and because this Court has the ability and the authority to order the Postal Service's compliance, this case is not moot. Further, because the parties do not dispute the material facts of this case, what remains for the Court is to decide is whether, given the undisputed facts, the Union is entitled to the relief requested. The Union will demonstrate the appropriateness of summary judgment in its favor.

## II.    BACKGROUND

The Union and the Postal Service are parties to a national collective bargaining agreement ("National Agreement") that provides for final and binding arbitration of grievances. Declaration of Peter Coradi attached hereto as Attachment 1 ("Coradi Dec.") at ¶ 3 and Article 15 of the National Agreement attached thereto as Ex. A at p. 103.

In December of 2004, the Postal Service terminated Christopher Broderick from his position as a full time window clerk at the Smithtown, New York Post Office, effective January 15, 2005. Coradi Dec. at ¶ 4 and Ex. B attached thereto at p. 2. The Union timely grieved Broderick's termination in accordance with Article 15 of the National Agreement. Id. and Ex. B attached thereto at p. 3. The parties were unable to resolve the grievance through the various steps of the grievance procedure and the Union appealed the matter to arbitration. Coradi Dec. at ¶ 4.

2

On June 8, 2005, and August 26, 2005, the parties appeared for an arbitration hearing before Arbitrator Harry R. Gudenberg.  Id. at ¶ 5; Ex. B attached thereto at p. 1.  Following the hearing, on September 12, 2005, Arbitrator Gudenberg issued an award sustaining the grievance:

> AWARD: For the reasons detailed in the full decision, the grievant is to be reinstated **with back pay**, less any other compensation received, **from January 15, through the implementation of this decision**.  However, he is not to be reinstated as a window clerk.  The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or such other position that does not handle cash transactions as they may determine.
>
> Jurisdiction will be retained in the event the parties request assistance in the implementation of this decision.

Coradi Dec. at ¶ 6 and Ex. B attached thereto (hereinafter referred to as "Gudenberg I") at p. 1 (emphasis added).

On October 20, 2005, the Postal Service, without agreement by the Union, placed Broderick in a part-time flexible position on the night shift at the Bethpage, New York facility. Coradi Dec. at ¶ 7.  Part time flexible employees are not guaranteed any more than four work hours per week.  Id.  As Broderick had formerly held a full time regular position on the day shift at the Smithtown, New York Post Office, the Union did not consider this offer to be in compliance with Gudenberg's September 12, 2005, award.  Id.  Broderick did not accept the Postal Service's offer to return to work under these circumstances.  Id.

In response to the Postal Service's offer, the Union wrote to Arbitrator Gudenberg on October 25, 2005, to explain that the Union did not consider this offer of part time employment at a different facility, on a different shift, to be in compliance with the award.  Coradi Dec. at ¶ 8 and Ex. C attached thereto at pp. 2-3.

Following receipt of the Union's correspondence, Arbitrator Gudenberg conducted a conference call with the parties and stressed that they were to work jointly to find an acceptable position for Broderick. Id. at ¶ 9. Nevertheless, the Postal Service refused to offer a full time position to Broderick that would have been equivalent to his former position. Id. Thus, on January 12, 2006, the Union again wrote to Arbitrator Gudenberg and informed him that the Postal Service continued to offer only part time positions to Broderick. Id at ¶ 10 and Ex. C attached thereto at pp. 3-4.

Following the Union's January 2006 correspondence to the Arbitrator, the Union requested a second hearing before Arbitrator Gudenberg to resolve the parties lingering disputes about implementation of the September 12, 2005, award. Id. at ¶ 11. Arbitrator Gudenberg set a second hearing date for Monday, July 17, 2006. Id.

Meanwhile, on Sunday, July 16, 2007, the Postal Service took the highly unusual step of issuing a notice of termination on a Sunday. Coradi Dec. at ¶ 12. The notice, effective immediately, was directed to Broderick and charged him with being absent without leave ever since he failed to accept the part time position that the Postal Service had offered him on October 20, 2005. Id. The Union timely grieved this second termination by the Postal Service. Id.

Following the second day of hearing before Arbitrator Gudenberg on July 17, 2006, the Arbitrator issued a second supplementary decision and award that provided as follows:

> AWARD: The grievant is to be returned to work at the Smithtown postal facility as a distribution clerk and is entitled to back pay and seniority credit for the reasons more fully discussed in the complete decision.

Coradi Dec. at ¶ 13 and Ex. C attached thereto (hereinafter "Gudenberg II") at p. 1. In this second decision, Arbitrator Gudenberg quoted extensively from his September 12, 2005,

4

decision. Gudenberg II at pp. 2, 5. Specifically, he restated his earlier award providing that the Postal Service was to pay Broderick "back pay, less any other compensation received, from January 15, through the implementation of this decision." Id. In other words, in his supplementary decision, Arbitrator Gudenberg ordered the Postal Service to pay Broderick back pay from January 15, 2005, until such time as it restored him to the position of a distribution clerk at the Smithtown facility. Gudenberg II at pp. 1, 2, 5-6.

Following this second supplementary award, the Postal Service still did not comply with Arbitrator Gudenberg's awards. Coradi Dec. at ¶ 14. According to the Postal Service "because Mr. Broderick had been removed from employment effective July 16, 2006, Mr. Gudenberg's supplemental award could not be implemented." Def.'s Mem. in Supp. of Mot. to Dismiss at p. 3. Thus, the Postal Service still did not return Broderick to a full time position at the Smithtown facility. Coradi Dec. at ¶ 14.

On January 26, 2007, the Union filed this lawsuit to enforce Arbitrator Gudenberg's awards. As of that date, the Postal Service had not returned Broderick to work as a full time distribution clerk at the Smithtown Post Office. Coradi Dec. at ¶ 15. Apparently, on November 3, 2006, the Postal Service had paid Broderick a certain amount of back pay for the period from January 15, 2005, until October 20, 2005, the date that the Postal Service offered him a part time position at the Bethpage facility. Id. The Union did not then and does not now consider this partial payment of back pay to be sufficient to comply with Arbitrator Gudenberg's awards because those awards require the Postal Service to pay back pay to Broderick from January 15, 2005, until such time as it reinstates him as a full time distribution clerk at the Smithtown Post Office. Id.

On February 8 and 23, 2007, the parties appeared before a new arbitrator, Arbitrator

Sarah Cannon Holden, to arbitrate the grievance the Union filed over Broderick's July 16, 2006,

termination for failing to report to the part time position at the Bethpage facility.  Id. at ¶ 16 and

Ex. D attached thereto (hereinafter "Holden Award") at 1.  On February 26, 2007, Arbitrator

Holden issued an award sustaining the grievance and providing:

> MERITS: I find that the Postal Service did not have just cause to issue the
> June 13, 2006 Notice of Removal to Christopher Broderick.  The grievant
> shall be reinstated **in accordance with the findings of the July 24, 2006**
> **Gudenberg Supplementary Award**.  There shall be no award of back
> pay associated with the instant grievance.

Coradi Dec. at ¶ 17 and Holden Award at p. 1 (emphasis added).

On March 12, 2007, the Postal Service finally restored Broderick to a full time position as

a distribution clerk at the Smithtown Post Office.  Coradi Dec. at ¶ 18.  The Postal Service now

claims that it has done all that it needs to do to comply with the Gudenberg awards.  Def.'s Mem.

in Supp. of Mot. to Dismiss at p. 1.  It takes the position that, because Arbitrator Holden declined

to award additional back pay in her award, the Holden Award insulated it from paying the back

pay ordered by Arbitrator Gudenberg.  Id. at 5.  It makes this claim despite the clear language of

Holden's award that directs the Postal Service to reinstate Broderick "in accordance with the

findings of the July 24, 2006 Gudenberg Supplementary Award", an award that specifically

provided for back pay until such time as the Postal Service restored Broderick to a full time

position as a distribution clerk at the Smithtown Post Office.  Holden Award at p. 1, Gudenberg I

at p. 1 and Gudenberg II at p. 1.  The Postal Service claims that it has done all it needs to do to

comply and therefore, this lawsuit is moot.    Def.'s Mem. in Supp. of Mot. to Dismiss.  As such,

it claims that this Court lacks jurisdiction to review the Union's claims and must therefore

dismiss those claims.  <u>Id</u>.

## III.    ARGUMENT

    A.    <u>Standard of Review of a Motion to Dismiss Under Federal Rule of Civil Procedure 12 (b)(1)</u>.

The Postal Service has filed the instant motion to dismiss under Rule 12 (b)(1) of the Federal Rules of Civil Procedure on the ground that this Court lacks jurisdiction because the dispute is now moot.

> The standard of review for a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12 (b)(1) is virtually identical to that for 12 (b)(6) motions, except that the Court is free to consider material outside the pleadings for purposes of resolving jurisdictional issues.

<u>Jackson v. District of Columbia Department of Health</u>, 2007 WL 1307891 * 1 (D.D.C.) (citing <u>Caesar v. United States</u>, 258 F.Supp.2d 1, 2 (D.D.C. 2005)); accord <u>Snyderman v. District of Columbia</u>, 2007 WL 1114136 * 3 (D.D.C.); and see, <u>National Postal Professional Nurses v. United States Postal Service</u>, 461 F.Supp.2d 24, 27 (D.D.C. 2006) (a motion to dismiss under 12 (b)(6) may not be granted unless it appears beyond doubt that plaintiff can prove no set of facts that support its claim entitling it to relief and the court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff).

In reviewing a motion for dismissal for lack of subject matter jurisdiction, the Court will "construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged."  <u>Thomas v. Principi</u>, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting <u>Barr v. Clinton</u>, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).  As the United States Court of Appeals for the District of Columbia has explained:

> When a court rules on a Rule 12 (b)(1) motion, it may "undertake an independent investigation to assure itself of its own subject matter jurisdiction." Hasse v. Sessions, 835 F.2d 902, 908 (D.C. Cir. 1987). This includes considering facts developed in the record beyond the complaint. Id. at 907. But at the Rule 12 (b)(1) stage, "the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant." Id.; Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1502-03 (D.C. Cir. 1988) (en banc); see Warth v. Seldin, 422 U.S. 490, 500-02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Settles v. U.S. Parole Commission, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

Generally, in the Rule 12 (b)(1) context, the plaintiff has the burden of proving jurisdiction. Caesar, 258 F.Supp.2d at 2. This is not necessarily the case, however, where the defendant has alleged that the plaintiff's claims must be dismissed as moot. "Under 12 (b)(1), a party may move to dismiss a case on grounds of mootness." Vietnam Veterans of America v. Principi, 2005 WL 901133 *2 (D.D.C.) (collecting cases). In such instances, the party asserting mootness bears the burden of proof:

> A case is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Albritton v. Kantor, 944 F.Supp. 966, 974 (D.D.C. 1996) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). An intervening factual event may render a claim moot because the change in circumstances deprives the plaintiff of a present right to be vindicated or causes him to no longer have a stake in the outcome of the litigation. Aiona v. Judiciary of Haw., 17 F.3d 1244, 1248 n. 6 (9th Cir. 1994). The intervening event will render the case moot only if the event eliminated the effect of the alleged violation and there is no reason to believe the alleged violation will recur. Honig v. Students fo the Cal. Sch. for the Blind, 471 U.S. 148, 149 (1985). **The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden**. Davis, 440 U.S. at 631; United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); Motor & Equip. Mfrs. Ass'n v. Nichol, 142 F.3d 449, 458-59 (D.C. Cir. 1998).

Id. at * 3 (emphasis added). Thus, in this instance, although the Union must establish the Court's jurisdiction to hear the underlying lawsuit, the burden then shifts to the Postal Service to prove

8

that the suit has become moot and is therefore no longer within the Court's jurisdiction.

B.     This Court Has Subject Matter Jurisdiction Over the Union's Claim.

1.     **The Court has jurisdiction to enforce Arbitrator Gudenberg's awards.**

This Court has jurisdiction over this action under the Postal Reorganization Act, 39

U.S.C. §§ 409 and 1208, and under 28 U.S.C. §§ 1331 and 1337.  As this Court pointed out in a

case involving the same parties as in the instant matter:

> It is well settled that this Court has jurisdiction under Chapter 12 of the
> Postal Reorganization Act, 39 U.S.C. § 1208 (b), to enforce arbitration
> awards which are final decisions on the merits and are consistent with the
> terms of the Collective Bargaining Agreement.

American Postal Workers Union, AFL-CIO v. United States Postal Service, 827 F.Supp. 836,

838 (D.D.C. 1993); and see, id. at n. 2 (although the Postal Reorganization Act does not

explicitly provide for enforcement of arbitration awards, the Supreme Court has noted its

similarity to § 301 (a) of the National Labor Relations Act which does provide for the

enforcement of arbitration awards).  "It is undisputed that this Court has original, though not

exclusive, jurisdiction over 'all actions brought by or against the Postal Service'".  National

Postal Professional Nurses v. United States Postal Service, 461 F.Supp.2d at 29 (quoting 39

U.S.C. § 409).

2.     **The dispute is not moot because the Postal Service has failed to comply with the Gudenberg Awards.**

Having raised the issue of mootness, it is the Postal Service's burden to prove that there is

no longer a live case or controversy.  Davis, 440 U.S. at 631; accord Motor & Equipment Mfrs.

Association v. Nichols, 142 F.3d 449, 459 (D.C. Cir. 1998); Fund for Animals v. Mainella, 335

F.Supp.2d 19, 23 (D.D.C. 2004). The burden of demonstrating mootness is a heavy one and the Postal Service has failed to carry its heavy burden. Davis, at 631.

A case is moot when it no longer involves a live case or controversy and where the parties no longer possess a cognizable interest in the outcome of the dispute. Id. (citing Powell v. McCormack, 395 U.S. 486, 496 (1969)). Even in the instance where a case was not moot when filed, it is possible that, during the course of litigation, intervening events may take place that "make it impossible to grant the prevailing party effective relief". Burlington N. R.R. Co. v. Surface Transportation Bd., 75 F.3d 685, 688 (D.C. Cir. 1996). In such circumstances, "the court may no longer decide the questions presented, but rather, must dismiss the action as moot." Izaak Walton League of America v. Johnson, 400 F.Supp.2d 38, 41 (D.D.C. 2005) (citing Burlington N. R.R. Co., at 688). "In determining whether a question has been mooted by intervening events, the court must look to the relief sought, and the court's ability to grant such requested relief." Id. "'So long as the court may order relief responsive to the wrong alleged, the appeal is not moot.'" Id. (quoting United States v. Martinson, 809 F.2d 1364, 1368 (9th Cir. 1987)).

In the complaint, the Union requested that this Court enforce Arbitrator Gudenberg's awards and order the "Postal Service to return Christopher Broderick to work at the Smithtown postal facility as a distribution clerk; **to pay him back pay**, less any other compensation received, **from January 15, 2005, until such date as the awards are fully implemented**; and to restore Mr. Broderick's seniority credit." Complaint at "Prayer for Relief" ¶ 2 (emphasis added). As Arbitrator Gudenberg made unequivocally clear in his second supplementary award, compliance with his initial award would not be complete until the Postal Service returned

10

Broderick to a full time position at the Smithtown Post Office.  Gudenberg I and Gudenberg II.

The Postal Service has yet to pay Broderick the full amount of back pay due to him under the

Gudenberg awards.  He is still due back pay from the period of October 20, 2005, until March 12,

2007, when the Postal Service finally returned him to work as a full time clerk at the Smithtown

facility as directed by the Gudenberg awards.  By ordering the Postal Service to fully comply

with the Gudenberg awards, as requested in the Union's complaint, this Court may yet grant the

Union's requested relief.

     In its motion to dismiss, the Postal Service claims that intervening events have rendered

this dispute moot.  This claim rests on the theory that Arbitrator Holden's decision not to issue an

award of back pay in a separate grievance somehow excused non-compliance with Arbitrator

Gudenberg's awards.  To the contrary, Arbitrator Holden's award included by reference the relief

afforded in Arbitrator Gudenberg's award: "The grievant shall be reinstated in accordance with

the findings of the July 24, 2006 Gudenberg Supplementary Award." Holden Award at p. 1.  In

his July 24, 2006, supplementary award Arbitrator Gudenberg quoted extensively from his earlier

September 12, 2005, decision.  Gudenberg II at pp. 2, 5.  Specifically, he restated his earlier

award providing that the Postal Service was to pay Broderick "back pay, less any other

compensation received, from January 15, through the implementation of this decision."  Id.

     In issuing a later award involving a separate grievance against the Postal Service,

Arbitrator Holden declined to award back pay because, had she issued an award of back pay, it

would have been redundant with Arbitrator Gudenberg's award.  She did not attempt, however,

nor did she possess the authority to "vacate" or otherwise alter or amend Arbitrator Gudenberg's

earlier awards. Indeed, the collective bargaining agreement provides that "in no event may the

terms and provisions of this Agreement be altered, amended, or modified by an arbitrator."
Coradi Dec. at ¶ 3 and Ex. A attached thereto at p. 103. It is a well established principal of labor
law that a final and binding arbitration award, issued in accordance with the terms of the
collective bargaining agreement becomes a part of that agreement. See, FRANK ELKOURI AND
EDNA ASPER ELKOURI, HOW ARBITRATION WORKS 582 (Alan Miles Ruben ed., 6th ed. 2003) (ad
hoc arbitrators' "awards interpreting a collective bargaining agreement usually become binding
parts of the agreement and will be followed by arbitrators thereafter."). As such, it may not be
altered or amended by a subsequent arbitration decision. Any subsequent arbitral decision that
purported to modify the Gudenberg awards would be in stark contrast to the contractual language
providing that an arbitrator may not alter the terms of the National Agreement.

Thus, the Postal Service's claim that Arbitrator Holden's award somehow changed the
circumstances requiring it to comply with Arbitrator Gudenberg's award of back pay from
January 15, 2005, until the award is implemented is without merit. This reading necessarily
requires the conclusion that Arbitrator Holden altered Arbitrator Gudenberg's initial award to cap
his earlier award of back pay on October 20, 2005, instead of on the date when the award was
actually implemented. The Holden Award simply does not say this. To afford the Holden
Award such a tortured meaning is tantamount to claiming that Arbitrator Holden acted beyond
the scope of her authority by modifying the collective bargaining agreement, thereby rendering
her award unenforceable. See, Madison Hotel v. Hotel Employees Restaurant Employees
International Union, Local 25, 144 F.3d 855, 858 (D.C. Cir. 1998) (citing United Steelworkers of
America v. Enterprise Wheel, 363 U.S. 593, 597 (1960)). ("An arbitration award that fails to
draw its essence from the collective bargaining agreement cannot stand."); and see, id. at 859

(quoting American Postal Workers Union v. United States Postal Service, 789 F.2d 1, 8 (D.C. Cir. 1986)) ("An arbitrator cannot, for instance, 'render [ ] a judgment based on external legal sources, wholly without regard to the terms of the parties' contract.'").

Thus, Arbitrator Holden's award was not an intervening event that would deny the Union of its requested relief. Arbitrator Gudenberg's awards remain fully enforceable and yet the Postal Service has not fully complied. If this Court is to give full meaning to both Arbitrator Gudenberg and Arbitrator Holden's awards, it must reject the Postal Service's claims and conclude that the Holden Award did not, indeed could not, disturb Arbitrator Gudenberg's order that the Postal Service pay back pay from January 15, 2005, until the award was implemented on March 12, 2007, when the Postal Service finally restored Broderick to a full time position at the Smithtown facility. No intervening event has changed the Postal Service's outstanding obligation to comply with Arbitrator Gudenberg's awards and this Court retains full authority to order the Postal Service to comply. The Postal Service's tortured reading of the Holden Award does not render this case moot.

C.    Standard of Review of a Motion for Summary Judgment.

The summary judgment standard is the basic vehicle to establish the continued existence of a claim and to narrow a case down to disputed material issues that need to be resolved by a fact-finder. Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses..."). Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party has demonstrated that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56 (c). "To determine which facts are 'material,' a court must look to the

substantive law on which each claim rests." <u>Vietnam Veterans of America v. Principi</u>, 2005 WL

901133 *4 (D.D.C.) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In

deciding a motion for summary judgment, the court "must view the evidence in the light most

favorable to [the non-moving party], draw all reasonable inferences in [its] favor, and eschew

making credibility determinations or weighing the evidence." <u>Lathram v. Snow</u>, 336 F.3d 1085,

1088 (D.C. Cir. 2003) (citations omitted).

> To prevail on a motion for summary judgment, the moving party must
> show that the nonmoving party "fail[ed] to make a showing sufficient to
> establish the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at
> 322.  By pointing to the absence of evidence proffered by the nonmoving
> party, a moving party may succeed on summary judgment.  <u>Id</u>.
>
> In addition, the nonmoving party may not rely solely on allegations or
> conclusory statements...[internal citations omitted]...Rather, the nonmoving
> party must present specific facts that would enable a reasonable jury to find
> in its favor...[internal citation omitted]...If the evidence "is merely
> colorable, or is not significantly probative, summary judgment may be
> granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

<u>Vietnam Veterans of America</u>, 2005 WL 901133 at * 5.

> D.    <u>Summary Judgment in Favor of the Union Is Appropriate Because There Are No
> Material Facts in Dispute</u>.

In accordance with the strong federal policy of enforcing labor arbitration awards and

because the Postal Service lacks any viable defense to compliance, the Court should enforce

Arbitrator Gudenberg's awards.

The standard for enforcing Arbitrator Gudenberg's awards is a highly deferential one

developed by the United States Supreme Court in order to preserve and protect the special

dispute resolution value of labor arbitration.  Federal courts have a duty to enforce arbitration

awards in all but extraordinary circumstances. Since deciding the *Steelworkers Trilogy* in 1960, the Supreme Court has often held that the judiciary's role in reviewing and enforcing arbitration awards arising from collectively bargained agreements between labor unions and employers is one of almost complete deference to the arbitration process. United Steelworkers v. American Manufacturing Co., 363 U.S. 564 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960); accord Hines v. Anchor Motor Freight, Inc., 424 U.S. 554 (1976). Courts are foreclosed from reviewing the merits of an arbitrated dispute and must defer to the determinations of the arbitrator. American Mfg. Co., 363 U.S. at 568 ("The courts...have no business weighing the merits of the grievance..."); Hines, 424 U.S. at 562. In Enterprise Wheel, the Supreme Court recognized that a labor arbitrator has wide discretion to fashion an award and remedy so long as it "draws its essence from" the parties' contract. 363 U.S. at 597. Ultimately, the important role an arbitrator plays in collective bargaining requires that courts give extraordinary deference to an arbitrator's decision and enforce labor arbitration awards unless the award presents "egregious deviations from the norm." OPEIU v. Washington Metro. Area Transit Auth., 724 F.2d 133, 137 (D.C. Cir. 1983); National Post Office Mailhandlers v. U.S. Postal Service, 751 F.2d 834, 840 (6th Cir. 1985).

Given the extraordinary deference the courts give to labor arbitration awards, there is little question that the Court should enforce Arbitrator Gudenberg's awards requiring the Postal Service to pay restore Broderick's seniority and to pay him back from January 15, 2005, until the award was implemented. The award is clear and unambiguous and fits squarely within the duties and authority given to Arbitrator Gudenberg by the Postal Service and the Union through the

National Agreement.  See <u>Warrior & Gulf</u>, 363 U.S. at 582 ("we think only the most forceful

evidence of a purpose to exclude the claim from arbitration can prevail...").  As the Supreme

Court realized more than forty years ago, the parties contracted for and sought Arbitrator

Gudenberg's decision and remedy, and "the courts have no business overruling him..."

<u>Enterprise Wheel</u>, 363 U.S. at 599.  Arbitrator Gudenberg's award should therefore be enforced.

 The Postal Service has presented no meaningful defense to its failure to comply with the

award.  In any event, because it failed to seek vacation of Arbitrator Gudenberg's award within

the applicable 90 day statute of limitations, it is barred from raising any affirmative defense to its

failure to comply with the award.  See, <u>Service Employees International Union, Local 722, AFL-

CIO v. Washington Hospital Center</u>, 1983 WL 2085 (D.D.C.) *2 n. 2; 115 L.R.R.M. 3581 (citing

D.C. Code for the proposition that actions to vacate an arbitration award must be brought within

90 days of receipt of the award).  As this court has pointed out, "The courts have uniformly held

that a party who fails to make a timely motion to vacate an arbitration award is barred from

raising affirmative defenses in a suit to enforce the award." <u>Sheet Metals Workers National

Pension Fund v. Metals and Machining Fabricators, Inc.</u>, 622 F.Supp. 116, 118 (D.D.C. 1985)

(citing *Fortune, Alsweet and Eldrige, Inc. v. Daniel*, 724 F.2d 1355 (9th Cir. 1983); <u>Chauffeurs,

Teamsters, etc. v. Jefferson Trucking</u>, 628 F.2d 1023 (7th Cir. 1980); <u>United Parcel Service, Inc.

v. Mitchell</u>, 451 U.S. 56, 60-62 (1981)); accord, <u>Service Employees International Union, Local

36 v. Office Center Services, Inc.</u>, 670 F.2d 404, 410-412 (3d Cir. 1982); <u>Local Union 26,

International Brotherhood of Electrical Workers, AFL-CIO v. CWS Electric</u>, 669 F.Supp. 495,

498 (D.D.C. 1987).

 In accordance with the *Steelworker Trilogy* and its progeny, there is a strong federal

policy of enforcing labor arbitration awards in all but the rarest of circumstances.  None of these

unusual circumstances are present in this case and the Postal Service has alleged no valid

grounds for the Court to decline to enforce this award.  Because there are no material facts in

dispute and the law is well settled, this Court should grant summary judgment in favor of the

Union and enforce Arbitrator Gudenberg's awards.

## IV.    CONCLUSION

For the foregoing reasons this Court should deny the Postal Service's motion to dismiss

the complaint and should grant the Union's motion for summary judgment.


Date: May 25, 2007                    Respectfully submitted,

                                      O'DONNELL, SCHWARTZ & ANDERSON, P.C.

                                      By:_____/s/: Brenda C. Zwack_____
                                         Brenda C. Zwack (D.C. Bar No. 482673)
                                         1300 L Street, N.W., Suite 1200
                                         Washington, DC  20005-4178
                                         (202) 898-1707  /  FAX (202)682-9276

                                      *Attorneys for the American Postal Workers Union,
                                      AFL-CIO*

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Plaintiff's Motion for Summary Judgment; Statement of Material Facts Not in Dispute; Opposition to Defendant's Motion to Dismiss and Memorandum in Support of Its Motion for Summary Judgment; Declaration of Peter Coradi and attached exhibits; and a proposed order were sent by First Class Mail, postage prepaid, to:

Michelle Johnson
U.S. Attorney's Office
Judiciary Center Building — Room E-4212
555 - 4th Street, N.W.
Washington, DC  20001

May 25, 2007                              /s/: Brenda C. Zwack
                                         Brenda C. Zwack

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

AMERICAN POSTAL WORKERS UNION,　　)
AFL-CIO　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　)　　　Civil Action No. 07-0178 (RMC)
　　　　　　　　　　　　　　　　　　)
UNITED STATES POSTAL SERVICE,　　　)
475 L'Enfant Plaza, S.W.　　　　　　　　)
Washington, D.C.  20260,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　)
_____)

## DECLARATION OF PETER CORADI

I, Peter Coradi, in lieu of an affidavit as permitted by 28 U.S.C. Section 1746, declare as

follows:

1.　　　　I first started working for the United States Postal Service ("USPS" or "Postal

Service") in August of 1984 as a letter carrier.  In September of 1984 I became a special delivery

messenger and joined the American Postal Workers Union, AFL-CIO ("Union").  My last full

time position with the Postal Service was as a clerk special delivery messenger in Brooklyn, New

York.

2.　　　　Since January of 1988, I have held various positions, first with the Brooklyn

Local of the American Postal Workers Union, and later with the National Union.  I was first

elected as a National Business Agent for special delivery messengers in November of 1996.

Since November of 2001 I have held my current full time Union position as a National Business

Agent for clerks.

3.　　　　At all times relevant to this lawsuit, the Union and the Postal Service were parties

to a national collective bargaining agreement (hereinafter the "National Agreement") in effect

┌─────────────────────────────┐
│   **ATTACHMENT  1**         │
└─────────────────────────────┘

from November 21, 2000, through November 20, 2006.  The is agreement initially was set to

expire on November 20, 2003, but by mutual agreement the parties twice extended the contract

ultimately through November 20, 2006.  The National Agreement is negotiated by the parties at

the national level.  Article 15 of the National Agreement provides a grievance procedure

culminating in binding arbitration.  A copy of Article 15 of the National Agreement is attached

hereto as Exhibit A.

4.     In December of 2004, the Postal Service terminated Christopher Broderick from

his position as a full time window clerk at the Smithtown, New York Post Office, effective

January 15, 2005.  The Union timely grieved Broderick's termination in accordance with Article

15 of the National Agreement.  The parties were unable to resolve the grievance through the

various steps of the grievance procedure and the Union appealed the matter to arbitration.

5.     On June 8, 2005, and August 26, 2005, the parties appeared for an arbitration

hearing before Arbitrator Harry R. Gudenberg.  I was the advocate for the Union at both days of

this hearing.

6.     Following the hearing, on September 12, 2005, Arbitrator Gudenberg issued an

award sustaining the grievance.  The award provided:

> AWARD: For the reasons detailed in the full decision, the grievant is to be
> reinstated with back pay, less any other compensation received, from
> January 15, through the implementation of this decision.  However, he is
> not to be reinstated as a window clerk.  The Service and the Union,
> together with the grievant, are to find placement for him as a distribution
> clerk or such other position that does not handle cash transactions as they
> may determine.
>
> Jurisdiction will be retained in the event the parties request assistance in
> the implementation of this decision.

A copy of this award is attached hereto as Exhibit B.

7.      On October 20, 2005, the Postal Service, without agreement by the Union, placed Broderick in a part-time flexible position on the night shift at the Bethpage, New York facility. Part time flexible employees are not guaranteed any more than four hours of work per week.  As Broderick had formerly held a full time regular position on the day shift at the Smithtown, New York Post Office, the Union did not consider this offer to be in compliance with Gudenberg's September 12, 2005, award.  Broderick did not accept the Postal Service's offer to return to work under these circumstances.

8.      In response to the Postal Service's offer, I wrote to Arbitrator Gudenberg on October 25, 2005, on behalf of the Union to report the Postal Service's actions and to explain that the Union did not consider this offer of part time employment at a different facility, on a different shift, to be in compliance with the award.

9.      Following receipt of my correspondence, Arbitrator Gudenberg conducted a conference call with the parties and stressed that we were to work jointly to find an acceptable position for Broderick.  Nevertheless, the Postal Service refused to offer a full time position to Broderick that would have been equivalent to his former position. Instead, it continued to offer various part time flexible positions at different facilities.

10.     On January 12, 2006, I again wrote to Arbitrator Gudenberg and informed him that the Postal Service continued to offer only part time positions to Broderick.

11.     After I wrote the January 12, 2006, letter, the Union requested a second hearing before Arbitrator Gudenberg to resolve the lingering disputes about implementation of the September 12, 2005, award.  Each time a hearing date was acceptable to the Union and to the

Arbitrator, the Postal Service claimed they were unable to proceed.  The matter was finally heard before Arbitrator Gudenberg on July 17, 2006.

12.    Meanwhile, on Sunday, July 16, 2007, the Postal Service took the highly unusual step of issuing a notice of termination on a Sunday.  In my experience, it is almost unheard of for the Postal Service to issue a removal notice on a Sunday.  The notice, dated June 13, 2006, was effective as indicated above, and was directed to Broderick and charged him with being absent without leave ever since he declined to accept the part time position that the Postal Service had offered him on October 20, 2005.  The Union timely grieved this second termination by the Postal Service.

13.    I was the Union's advocate at the second hearing before Arbitrator Gudenberg. On July 17, 2006, after this second hearing Arbitrator Gudenberg issued a second supplementary decision and award that provided as follows:

> AWARD: The grievant is to be returned to work at the Smithtown postal facility as a distribution clerk and is entitled to back pay and seniority credit for the reasons more fully discussed in the complete decision.

A copy of this award is attached hereto as Exhibit C.

14.    Following this second supplementary award, the Postal Service still did not comply with Arbitrator Gudenberg's awards.  They still did not return Broderick to a full time position at the Smithtown facility.

15.    As of the date that the Union filed this lawsuit, the Postal Service had not returned Broderick to work as a full time distribution clerk at the Smithtown Post Office.  Apparently, on November 3, 2006, the Postal Service had paid Broderick a certain amount of back pay for the period from January 15, 2005, until October 20, 2005, the date that the Postal Service offered him a part time position at the Bethpage facility.  The Union did not then and does not now

4

consider this partial payment of back pay to be sufficient to comply with Arbitrator Gudenberg's awards because those awards require the Postal Service to pay back pay to Broderick from January 15, 2005, until such time as it reinstates him as a full time distribution clerk at the Smithtown Post Office.

16.    On February 8 and 23, 2007, the parties appeared before a new arbitrator, Arbitrator Sarah Cannon Holden, to arbitrate the grievance the Union filed over Broderick's July 16, 2006, termination for failing to report to the part time position at the Bethpage facility.  Once again, I was the advocate for the Union.

17.    On February 26, 2007, Arbitrator Holden issued an award sustaining the grievance and providing:

> MERITS: I find that the Postal Service did not have just cause to issue the June 13, 2006 Notice of Removal to Christopher Broderick.  The grievant shall be reinstated in accordance with the findings of the July 24, 2006 Gudenberg Supplementary Award.  There shall be no award of back pay associated with the instant grievance.

A copy of this award is attached hereto as Exhibit D.

18.    On March 12, 2007, the Postal Service finally restored Broderick to a full time position as a distribution clerk at the Smithtown Post Office.  Nevertheless, they have never paid him the back pay he is due covering the period from October 20, 2005, through March 12, 2007, when the Postal Service finally implemented the restoration portion of Arbitrator Gudenberg's awards.  Arbitrator Holden's award did not say that the Postal Service did not need to comply with Arbitrator Gudenberg's awards.  Instead, her award said that the Postal Service was supposed to act in accordance with those awards.  Until the Postal Service pays Broderick his full back pay for all of the time covered by the Gudenberg awards, the Postal Service will not be in compliance with those awards.

5

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 18 day of May, 2007.

Peter Coradi

# COLLECTIVE BARGAINING AGREEMENT

Between
**American Postal Workers Union, AFL-CIO**

And
**U.S. Postal Service**

**November 21, 2000
November 20, 2006**



EXHIBIT A

**Article 15.1**

### Section 9. Field Federal Safety and Health Councils

In those cities where Field Federal Safety and Health Councils exist, one representative of the Union who is on the Local Safety and Health Committee in an independent postal installation in that city and who serves as a member of such Councils, will be permitted to attend the meetings. Such employee will be excused from regularly assigned duties without loss of pay. Employer authorized payment as outlined above will be granted at the applicable straight time rate, provided the time spent in such meetings is a part of the employee's regular work day.

(The preceding Article, Article 14, shall apply to Transitional Employees)

## ARTICLE 15
## GRIEVANCE-ARBITRATION PROCEDURE

### Section 1. Definition

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

### Section 2. Grievance Procedure Steps

**Step 1:**

(a)  Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within

90

**Article 15.2 (Step 1)**

fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. The Union also may initiate a grievance at Step l within l4 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required. A Step l Union grievance may involve a complaint affecting more than one employee in the office. When the Union files a class action grievance, Management will designate the appropriate employer representative responsible for handling such complaint.

(b) In any such discussion the supervisor shall have authority to settle the grievance. The steward or other Union representative likewise shall have authority to settle or withdraw the grievance in whole or in part. No resolution reached as a result of such discussion shall be a precedent for any purpose.

(c) If no resolution is reached as a result of such discussion, the supervisor shall render a decision orally stating the reasons for the decision. The supervisor's decision should be stated during the discussion, if possible, but in no event shall it be given to the Union representative (or the grievant, if no Union representative was requested) later than five (5) days thereafter unless the parties agree to extend the five (5) day period. Within five (5) days after the supervisor's decision, the supervisor shall, at the request of the Union representative, initial the standard grievance form that is used at Step 2 confirming the date upon which the decision was rendered.

(d) The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the supervisor's decision. Such appeal

### Article 15.2 (Step 2)

shall be made by completing a standard grievance form developed by agreement of the parties, which shall include appropriate space for at least the following:

1. Detailed statement of facts;

2. Contentions of the grievant;

3. Particular contractual provisions involved; and

4. Remedy sought.

**Step 2:**

(a)  The standard grievance form appealing to Step 2 shall be filed with the installation head or designee. In any associate post office of twenty (20) or less employees, the Employer shall designate an official outside of the installation as the Step 2 official, and shall so notify the Union Step 1 representative.

(b)  Any grievance initiated at Step 2, pursuant to Article 2 or 14 of this Agreement, must be filed within 14 days of the date on which the Union or the employee first learned or may reasonably have been expected to have learned of its cause.

(c)  The installation head or designee will meet with the steward or a Union representative as expeditiously as possible, but no later than seven (7) days following receipt of the Step 2 appeal unless the parties agree upon a later date. In all grievances appealed from Step 1 or filed at Step 2, the grievant shall be represented in Step 2 for all purposes by a steward or a Union representative who shall have authority to settle or withdraw the grievance as a result of discussions or compromise in this Step. The installation head or designee in Step 2 also shall have authority to grant or settle the grievance in whole or in part.

**Article 15.2.(Step2).(g)**

(d)   At the meeting the Union representative shall make a full and detailed statement of facts relied upon, contractual provisions involved, and remedy sought. The Union representative may also furnish written statements from witnesses or other individuals. The Employer representative shall also make a full and detailed statement of facts and contractual provisions relied upon. The parties' representatives shall cooperate fully in the effort to develop all necessary facts, including the exchange of copies of all relevant papers or documents in accordance with Article 31. The parties' representatives may mutually agree to jointly interview witnesses where desirable to assure full development of all facts and contentions. In addition, in cases involving discharge either party shall have the right to present no more than two witnesses. Such right shall not preclude the parties from jointly agreeing to interview additional witnesses as provided above.

(e)   Any settlement or withdrawal of a grievance in Step 2 shall be in writing or shall be noted on the standard grievance form, but shall not be a precedent for any purpose, unless the parties specifically so agree or develop an agreement to dispose of future similar or related problems.

(f)   Where agreement is not reached the Employer's decision shall be furnished to the Union representative in writing, within ten (10) days after the Step 2 meeting unless the parties agree to extend the ten (10) day period. The decision shall include a full statement of the Employer's understanding of (1) all relevant facts, (2) the contractual provisions involved, and (3) the detailed reasons for denial of the grievance.

(g)   If the Union representative believes that the facts or contentions set forth in the decision are incomplete or inaccurate, such representative should, within ten (10) days of receipt of the Step 2 decision, transmit to the Employer's representative a written statement setting forth corrections or

**Article 15.2.(Step 3)**

additions deemed necessary by the Union. Any such statement must be included in the file as part of the grievance record in the case. The filing of such corrections or additions shall not affect the time limits for appeal to Step 3 or arbitration.

(h)   The Union may appeal an adverse Step 2 decision to Step 3. Any such appeal must be made within fifteen (15) days after receipt of the Employer's decision unless the parties' representatives agree to extend the time for appeal. However, the Union may appeal an adverse Step 2 decision directly to arbitration for disciplinary grievances or contract grievances which involve the interpretation, application of, or compliance with the provisions of any local Memorandum of Understanding not in conflict with this Agreement, and those issues the parties have agreed are appealed to Expedited Arbitration. These grievances will be appealed to the appropriate Grievance/Arbitration Processing Center within thirty (30) days after the receipt of the Employer's Step 2 decision. Any appeal must include copies of (1) the standard grievance form, (2) the Employer's written Step 2 decision, and, if filed, (3) the Union corrections or additions to the Step 2 decision.

**Step 3:**

(a)   Any appeal from an adverse decision in Step 2 shall be in writing to the appropriate management official at the Grievance/Arbitration Processing Center, with a copy to the Employer's Step 2 representative, and shall specify the reasons for the appeal.

(b)   The grievant shall be represented at the Employer's Step 3   Level by a Union's Regional representative, or designee. The Step 3 meeting of the parties' representatives to discuss the grievance shall be held within fifteen (15) days after it has been appealed to Step 3. Each party's representative shall be responsible for making certain that all

**Article 15.2.(Step 3)**

relevant facts and contentions have been developed and considered. The Union representative shall have authority to settle or withdraw the grievance in whole or in part. The Employer's representative likewise shall have authority to grant the grievance in whole or in part. In any case where the parties' representatives mutually conclude that relevant facts or contentions were not developed adequately in Step 2, they shall have authority to return the grievance to the Step 2 level for full development of all facts and further consideration at that level. In such event, the parties' representatives at Step 2 shall meet within seven (7) days after the grievance is returned to Step 2. Thereafter, the time limits and procedures applicable to Step 2 grievances shall apply.

(c) The Employer's written Step 3 decision on the grievance shall be provided to the Union's Step 3 representative within fifteen (15) days after the parties have met in Step 3, unless the parties agree to extend the fifteen (15) day period. Such decision shall state the reasons for the decision in detail and shall include a statement of any additional facts and contentions not previously set forth in the record of the grievance as appealed from Step 2. If either party's Step 3 representative believes that an interpretive issue under the National Agreement or some supplement thereto which may be of general application is involved in the case**,** the issue will be discussed with the appropriate National Union/Management Representatives at the Headquarters Level. If either party's National Representative determines the issue to be interpretive, a written notice will be sent to the other party specifying in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the initiating party's contention. The grievance(s) shall be held at the Area and/or District Level pending discussion at the national level or the outcome of a National Arbitration award.

 (d) The Union may appeal an adverse decision directly to arbitration at the appropriate Grievance/Arbitration Process-

**Article 15.2.(Step 3)**

ing Center within twenty-one (21) days after the receipt of the Employer's Step 3 decision in accordance with the procedure hereinafter set forth.

(e)    Where grievances appealed to Step 3 involve the same, or substantially similar issues or facts, one such grievance to be selected by the Union representative shall be designated the "representative" grievance. If not resolved at Step 3, the "representative" grievance may be appealed to arbitration in accordance with the above and placed at the head of the appropriate arbitration docket, or the issue will be referred to the parties' national representatives at the Headquarters level pursuant to (c) above. All other grievances which have been mutually agreed to as involving the same, or substantially similar issues or facts as those involved in the "representative" grievance shall be held at Step 3 pending resolution of the "representative" grievance, provided they were timely filed at Step 1 and properly appealed to Steps 2 and 3 in accordance with the grievance procedure.

Following resolution of the "representative" grievance, the parties involved in that grievance shall meet at Step 3 to apply the resolution to the other pending grievances involving the same, or substantially similar issues or facts. Disputes over the applicability of the resolution of the "representative" grievance shall be resolved through the grievance-arbitration procedures contained in this Article; in the event it is decided that the resolution of the "representative" grievance is not applicable to a particular grievance, the merits of that grievance shall also be considered.

(f)    In order to discourage the filing of multiple local grievances involving any new or changed District or Area-wide policy, instructions, or guidelines, the APWU Regional Coordinator or National Business Agent may file one grievance concerning such policy, instructions, or guidelines, directly at Step 3 of the grievance procedure.  The grievance

**Article 15.2.(Step 4)**

may be filed within fourteen (14) days of the date on which such union representative first learned or may reasonably have been expected to have learned of the implementation of such policy, instructions, or guidelines. Timely local grievances, which had already been filed concerning such policy, instructions, or guidelines, will be held at or returned to Step 2 of the grievance procedure, as applicable, pending the resolution of the grievance filed directly at Step 3. Thereafter, local grievances will be finally adjudicated in accordance with the resolution of the grievance filed directly at Step 3. If not resolved, the grievance filed directly at Step 3 may be appealed to arbitration within twenty-one (21) days and placed at the head of the appropriate arbitration docket.

**Step 4:**

(a)  In any dispute properly initiated at this Step by the appropriate National Union/Management Representative, the parties shall meet at the National level promptly, but in no event later than thirty (30) days after initiating such dispute in an effort to define the precise issues involved, develop all necessary facts and reach agreement. The Union representative shall have authority to settle or withdraw the dispute in whole or in part. The Employer's representative shall have authority to grant or settle the dispute in whole or in part. The parties' Step 4 representatives may, by mutual agreement, return any dispute to Step 3 where (a) the parties agree that no national interpretive issue is fairly presented or (b) it appears that all relevant facts have not been developed adequately. In such event, the parties shall meet at Step 3 within fifteen (15) days after the dispute is returned to Step 3. Thereafter the procedures and time limits applicable to Step 3 grievances shall apply. Should the parties at the National level fail to reach agreement, then within fifteen (15) days of such meeting each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to the interpretive dispute. In the event the parties have failed to reach agreement within

97

**Article 15.3**

sixty (60) days of the initiation of the dispute, the Union then may appeal it to national arbitration within thirty (30) days thereafter.    Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

[see Memo, page 316]

**Section 3.  Mediation**

Where the local parties identify the need for either assistance in the grievance/arbitration procedure or the need to improve the labor/management relationship, the following mediation process may be invoked:

   A.  The local installation head and the local Union president (local parties) may jointly initiate a request for mediation where they identify such a need in a particular installation.   Such joint request must be in writing and submitted to the parties' designated Area/Regional level representatives.

   B.  Such Area/Regional level representatives may also recommend mediation for a particular installation. However, when a recommendation for mediation is made by the   Area/Regional   level   representatives,   such recommendation must be discussed with and agreed to by the local parties before the mediation process can be invoked at the local site.

   C.  The mediation will be conducted jointly by the Union official designated by the President of the Union and management official designated by the Vice President/Labor Relations (USPS). The designated officials will have been trained, and/or certified in the dispute resolution process. Such   designated   union/management   mediation representatives will be utilized to assist the local parties in an effort to resolve timely grievances, as defined in Article 15,

**Article 15.3.F**

Sections 1 and 2, as well as any identified local issues or problems.

D. The designated union/management mediation representatives will meet at the local installation within thirty (30) days of the joint mediation request, which is described in Section 3.A or B above. At least seven (7) days prior to the on-site meeting, the local parties will jointly provide the mediation representatives with an agenda and all available relevant information. In the event the local parties cannot agree on an agenda for mediation, each party will submit their respective agendas to the mediation representatives seven (7) days prior to the on-site meeting, as well as all available relevant information.

E. The mediation will be held with the local parties to explore ways of resolving the previously submitted agenda items, as well as to seek ways of improving the labor/management climate within the installation. The mediation process, including all meetings connected with mediation, is considered to be off-the-record. However, all resolutions will be on the record, in writing and jointly signed by the local parties. Where the local parties agree, a particular mediation resolution(s) will serve as precedent for that installation, provided such resolution does not violate the National Agreement.

If the local parties are unable to reach a resolution on pending grievances of those local issues for which they have jointly requested mediation, then the mediation representatives may jointly resolve any of the above referenced issues or grievances.

F. The Employer's mediation   representative will provide to the appropriate Union official a statement of position for each grievance(s) listed on the agenda, which is not resolved through mediation, within fifteen (15) days of the final mediation meeting. Within twenty-one (21) days of

### Article 15.4

receipt of the statement of position, the Union may appeal such grievance(s) to District level arbitration.

#### Section 4. Grievance Procedure - General

A. The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in settlement or withdrawal of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end. **Every effort shall be made to ensure timely compliance and payment of monetary grievance settlements and arbitration awards. The Employer agrees that upon receipt of necessary paperwork from the grievant and/or union, concerning a grievance settlement or arbitration award, monetary remuneration will be made. The necessary paperwork is the documents and statements specified in Subchapter 436.4 of the ELM. The Employer will provide the union copies of appropriate pay adjustment forms, including confirmation that such forms were submitted to the appropriate postal officials for compliance and that action has been taken to ensure that affected employee(s) receives payment and/or other benefits. In the event that an employee is not paid within sixty (60) days after submission of all the necessary paperwork, such employee, upon request, will be granted authorization from management to receive a pay advance equal to the net amount due, or seventy (70) percent of the gross payment owed the employee, whichever is less. In the event of a dispute between the parties concerning the correct amount to be paid, the advance required by this section will be the amount that is not in dispute.**

B. The failure of the employee or the Union in Step 1, or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance. However, if the

### Article 15.5.A

Employer fails to raise the issue of timeliness at Step 2, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived.

C. Failure by the Employer to schedule a meeting or render a decision in any of the Steps of this procedure within the time herein provided (including mutually agreed to extension periods) shall be deemed to move the grievance to the next Step of the grievance-arbitration procedure.

D. It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, such dispute may be initiated at the Step 4 level by either party. Such a dispute shall be initiated in writing and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contention of either party. Thereafter the parties shall meet in Step 4 within thirty (30) days in an effort to define the precise issues involved, develop all necessary facts, and reach agreement. Should they fail to agree, then, within fifteen (15) days of such meeting, each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to such issues. In the event the parties have failed to reach agreement within sixty (60) days of the initiation of the dispute in Step 4, the Union then may appeal it to arbitration, within thirty (30) days thereafter. Any local grievances filed on the specific interpretive issue shall be held in abeyance at the appropriate level pending resolution of the national interpretive dispute.

### Section 5. Arbitration

#### A. General Provisions

1. A request for arbitration shall be submitted within the specified time limit for appeal.

**Article 15.5.A.2**

2. No grievance may be arbitrated at the National level except when timely notice of appeal is given the Employer in writing by the National President of the Union. No grievance may be appealed to arbitration at the District panel level except when timely notice of appeal is given in writing to the appropriate management official at the Grievance/Arbitration Processing Center by the certified representative of the Union in the Area. Such representative shall be certified to appeal grievances by the National President of the Union to the Employer at the National level.

3. All grievances appealed to arbitration will be placed on the appropriate pending arbitration list in the order in which appealed. The Employer, in consultation with the Union, will be responsible for maintaining appropriate dockets of grievances, as appealed, and for administrative functions necessary to assure efficient scheduling and hearing of cases by arbitrators at all levels.

4. In order to avoid loss of available hearing time, except in National level cases, a minimum of six (6) expedited or three (3) regular cases, when available, are to be scheduled for each hearing date. In addition, pending cases on the docket in the order in which appealed should be assigned to the designated advocates no less than sixty (60) days prior to the scheduled date and, if possible, the parties will discuss the cases no less than thirty (30) days prior to the scheduled date. The parties agree that backup cases will include all cases pending arbitration at the location. These backup cases will be scheduled in the order they appear on the District docket when available in the event of late settlement or withdrawal of grievances before the hearing. In the event that either party withdraws all cases less than

five (5) days prior to the scheduled arbitration date, and the parties are unable to agree on scheduling other cases on that date, the party withdrawing the cases shall pay the full costs of the arbitrator for that date. In the event that the parties settle and/or withdraw all cases five (5) or more days prior to the scheduled arbitration date, backup case**s** on the appropriate arbitration list shall be scheduled. If the parties settle case**s** less than five (5) days prior to the scheduled arbitration date and are unable to agree to schedule another case, the parties shall share the costs of the arbitrator for that date. This paragraph shall not apply to National level arbitration cases.

5. Arbitration hearings normally will be held during working hours where practical. Employees whose attendance as witnesses is required at hearings during their regular working hours shall be on Employer time when appearing at the hearing, provided the time spent as a witness is part of the employee's regular working hours. Absent a more permissive local past practice and at no cost to the Employer, the Employer will permit one (1) change of work schedule per case scheduled for arbitration for either the grievant or a witness, provided notice is given to his or her immediate supervisor at least two (2) days prior to the scheduled arbitration hearing.

6. All decisions of an arbitrator will be final and binding. All decisions of arbitrators shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator. Unless otherwise provided in this Article, all costs, fees, and expenses charged by an arbitrator will be shared equally by the parties.

**Article 15.5.A.7**

7.  All arbitrators on the Regular District Panels and the
    Expedited Panels and on the National Panel shall
    serve for the term of this Agreement and shall
    continue to serve for six (6) months thereafter,
    unless the parties otherwise mutually agree.

8.  Arbitrators on the National Panel and on the Regular
    and Expedited District Panels shall be selected by
    the method agreed upon by the parties at the
    National Level.

9.  In any arbitration proceeding in which a Union feels
    that its interests may be affected, it shall be entitled
    to intervene and participate in such arbitration
    proceeding, but it shall be required to share the cost
    of such arbitration equally with any or all other
    Union parties to such proceeding. Any dispute as to
    arbitrability may be submitted to the arbitrator and
    be determined by such arbitrator. The arbitrator's
    determination shall be final and binding.

**B. District Level Arbitration - Regular**

1.  At the appropriate Grievance/Arbitration Processing
    Center four (4) separate lists of cases to be heard in
    arbitration shall be maintained for the Union: (a) one
    for all removal cases and cases involving
    suspensions for more than 14 days or 14 days or less
    referred from Expedited Arbitration, (b) one for all
    cases referred to Expedited Arbitration, (c) one for
    Contract disputes, and (d) one for Impasses from
    Local Negotiations appealed to arbitration at the
    appropriate Grievance/Arbitration Processing
    Center. In each District separate panels will be
    established for scheduling and hearing cases
    involving (a) removals and suspensions for more
    than 14 days, and suspensions of 14 days or less
    referred from Expedited Arbitration; (b) Contract

104

**Article 15.5.B.5**

disputes, (c) cases referred to Expedited Arbitration, and (d) Impasses from Local Negotiations.

a. Arbitration hearings are to be scheduled and heard within 120 days following receipt of the arbitration appeal, unless the parties agree upon a later date.

[see Memo, page 317]

2. Cases will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree. **Prior to arbitration dates being scheduled by the parties for the next round of scheduling, each party may, at its option, advance one case per month to the top of the docket.**

3. Only discipline cases involving suspensions of 14 days or less and those other disputes as may be mutually determined by the parties shall be referred to Expedited Arbitration in accordance with Section C hereof.

[see Memo, page 311]

4. Cases referred to arbitration, which involve removals or suspensions for more than 14 days, shall be scheduled for hearing at the Grievance/Arbitration Processing Center at the earliest possible date in the order in which appealed by the Union.

5. If either party believes that a case referred to Regular Arbitration involves an interpretative issue under the National Agreement or some supplement thereto which may be of general application, that party's representative shall request input from their appropriate National Representative at the

**Article 15.5.B.5**

Headquarters level. If either party's representative at the Headquarters level determines the case is interpretive, a notice will be sent to the other party. The case will be held pending the outcome of the National interpretive dispute. If both parties' representatives determine the case does not involve an interpretive issue, the case if already scheduled for arbitration will be heard before the same arbitrator who was originally scheduled to hear the case. Further, if the hearing had convened, the case will continue at the same stage of arbitration.

[see Memo, page 316]

6. The arbitrators on each Regular District Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. The hearing time available for arbitration will be distributed among offices and crafts.

7. Normally, there will be no transcripts of arbitration hearings or filing of post-hearing briefs in cases heard in Regular District level arbitration, except either party at the National level may request a transcript. Either party at the hearing may request to file a post-hearing brief in contract arbitrations. In Regular District level discipline/discharge arbitrations, post-hearing briefs will be permitted only by mutual agreement of the parties or by direction of the arbitrator. However, each party may file a written statement setting forth its understanding of the facts and issues and its argument at the beginning of the hearing and also shall be given an adequate opportunity to present argument at the conclusion of the hearing.

8. The arbitrator in any given case should render an

**Article 15.5.C.3**

award therein within thirty (30) days of the close of the record in the case.

### C. District Level Arbitration - Expedited

1. The parties agree to continue the utilization of an expedited arbitration system for disciplinary cases of 14 days suspension or less which do not involve interpretation of the Agreement and for such other cases as the parties may mutually determine.

[see Memo, page 311]

2. If either party concludes that the issues involved are of such complexity or significance as to warrant reference to the Regular District Arbitration Panel, that party shall notify the other party of such reference at least twenty-four (24) hours prior to the scheduled time for the expedited arbitration.

3. The hearing shall be conducted in accordance with the following:

    a. the hearing shall be informal;

    b. no briefs shall be filed or transcripts made;

    c. there shall be no formal rules of evidence;

    d. the hearing shall normally be completed within one day;

    e. if the arbitrator or the parties mutually conclude at the hearing that the issues involved are of such complexity or significance as to warrant reference to the Regular District Arbitration Panel, the case shall be referred to that panel; and

**Article 15.5.C.3.f**

   f. the arbitrator may issue a bench decision at the hearing but in any event shall render a decision within forty-eight (48) hours after conclusion of the hearing. Such decision shall be based on the record before the arbitrator and may include a brief written explanation of the basis for such conclusion. These decisions will not be cited as a precedent. The arbitrator's decision shall be final and binding. An arbitrator who issues a bench decision shall furnish a written copy of the award to the parties within forty-eight (48) hours of the close of the hearing.

4. No decision by a member of the Expedited Panel in such a case shall be regarded as a precedent or be cited in any future proceeding, but otherwise will be a final and binding decision.

5. The Expedited Arbitration Panel shall be developed by the National parties, on a District level.

**D. National Level Arbitration**

1. Only cases involving interpretive issues under this Agreement or supplements thereto of general application will be arbitrated at the National level.

2. A docket of cases appealed to arbitration at the National level shall be maintained for the Union. The arbitrators on the National Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. Cases on the docket will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree.

**Article 16.1**

### Section 6. Administration

The parties recognize their continuing joint responsibility for efficient functioning of the grievance procedure and effective use of arbitration. Commencing April 1, 1979, and quarterly thereafter, the Employer will furnish to the President of the Union a copy of a quarterly report containing the following information covering operation of the arbitration procedure at the National level, and for each Grievance/Arbitration Processing Center separately:

(a) number of cases appealed to arbitration;

(b) number of cases scheduled for hearing;

(c) number of cases heard;

(d) number of scheduled hearing dates, if any, which were not used;

(e) the total number of cases pending but not scheduled at the end of the quarter.

(The preceding Article, Article 15, shall apply to Transitional Employees)

[see Memo, page 317]

### ARTICLE 16
### DISCIPLINE PROCEDURE

### Section 1. Principles

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to,

109

REGULAR ARBITRATION PANEL
--------------------------------)
                                )
In the matter of the Arbitration )    GRIEVANT: C. Broderick
                                )
        between                 )     POST OFFICE:Smithtown. NY
                                )
  UNITED STATES POSTAL SERVICE  )     USPS CASE #A00C-4A-D05055036
                                )     APWU CASE #78700404
        and                     )
                                )
  AMERICAN POSTAL WORKERS UNION, )
  AFL-CIO                        )
                                )
--------------------------------)

BEFORE:  HARRY R. GUDENBERG, ARBITRATOR

APPEARANCES:

        For the U.S. Postal Service: Sandra L. Peets
                                     Labor Relations Specialist

        For the A.P.W.U.:            Peter Coradi
                                     National Business Agent


Place of the Hearing: Hauppauge, New York

Dates of Hearings:  June 8 and August 26, 2005

Date of Award: September 12, 2005

Relevant Contract Provisions: Articles 16, 19

Contract Year: 2004

Type of Grievance: Disc.

AWARD: For the reasons detailed in the full decision, the grievant
is to be reinstated with back pay, less any other compensation
received, from January 15, through the implementation of this
decision . However, he is not to be reinstated as a window clerk.
The Service and the Union, together with the grievant, are to find
placement for him as a distribution clerk or such other position
that does not handle cash transactions as they may determine.

Jurisdiction will be retained in the event the parties request
assistance in the implementation of this decision.

Arbitrator:

                                     Harry R. Gudenberg

EXHIBIT B

The parties in accordance with the terms of the National Agreement appointed this Arbitrator to hear the dispute in this case and issue a decision and award.

At the hearing the parties were afforded full opportunity to present oral and written evidence, examine and cross examine the witnesses who testified under oath, engage in oral argument, and otherwise support their positions.

The testimony and evidence of the parties and their positions and arguments presented at the hearing and thereafter have been fully considered in the issuance of this opinion and award.

### STIPULATED ISSUE

Was the notice of removal dated December 8, 2004 effective as of January 15, 2005 issued to the grievant for just cause? If not, what shall be the remedy?

### SUMMARY OF THE CASE

The grievant was issued a notice of removal in December 2004 which said in pertinent part:

> "During April and July of 2004, Postal Inspectors posing as customers made four stamp purchases in varying amounts from you at the Smithtown NY Post Office. On two of these occasions you did not properly record the sale of the stamps into the retail terminal nor did you provide any form of customer receipt.
>
> Analyses of your daily transaction reports for the dates of the Inspection Service purchases disclosed that you only recorded a portion of the transactions. On April 24, 2004 an undercover Postal Inspector purchased one $37.00 roll of first class stamps and five $7.40 booklets of first class stamps for

a total transaction of $74.00 you only recorded the sale of the five booklets into the POS retail terminal and did not record the sale of the $37.00 roll of stamps.

On July 29, 2004 an undercover Postal Inspector purchased three sheets of one dollar stamps valued at $20.00 each for a total transaction of $60.00. You only recorded the sale of one of these sheets into the POS retail terminal and did not record the sale of the remaining $40.00 of stamps.

On November 1, 2004 Window Technician T-6 Grace Doria reported a discrepancy of $1,100.00 in the advance deposit for the day. It was determined that eleven $100.00 bills were missing from the deposit money. Supervisor of Customer Service Kirk Jablonsky accessed the duplicate keys and in the presence of Supervisor of Customer Service Keith Krongel, T-6 Doria and SSA Louis Delveccio opened your cash drawer. An audit of the cash drawer's contents was conducted by these same individuals. Eleven $100.00 bills were discovered in the far left bill section of the drawer. The drawer was returned to the safe compartment and the compartment was sealed.

On November 2, 2004 an audit of the cash drawer was conducted with you and Postal Inspectors in the presence of your APWU representative. The drawer contained $1,180.80 in cash of which $1,100.00 in the form of eleven $100.00 bills, was found in the far left compartment of the drawer. A review of your final transfer initiation report for November 1, 2004 shows that you had a total of eleven $100.00 bills in your deposit. When interviewed by Postal inspectors you stated that you did not know how the missing funds had gotten into your drawer and that you did not notice any extra funds in your drawer when you secured it in the safe."

The grievant was then placed on administrative leave with pay.

On December 6, 2004 a pre-disciplinary interview was held attended by the grievant, the shop steward and the supervisor.

The Service then issued the notice of removal and cited provisions of the Employee and Labor Relations Manual which the grievant violated, specifically Section 661.53 governing employee misconduct and Section 661.3 governing standards of conduct.

A grievance was timely filed. At step 2 the grievance said:

"At issue in the instant grievance is the removal of the grievant, the sole charge being misappropriation of funds.

-3-

Under the charge in the NOR ((Notice of Removal), the Service states that on two occasions, out of four, postal inspectors made stamp purchases and the grievant allegedly did not properly record the sale of stamps nor properly provide a receipt to the "customer".

The NOR further states that an alleged analysis of his daily transaction reports disclosed that he only recorded a portion of the transactions. It then goes on to detail the alleged improper transactions.

No where in the Notice of Removal does it state that the grievant misappropriated funds. It dos not state how, when or even how much. It does not support the charge.

Further, based upon the alleged findings of the inspection service in an Inspectors Memorandum, the Union requested information to rebut this charge. To date, there has not been any information provided. The Union asked for the printouts of the grievant's daily transactions reports; nothing was provided. The Union asked to interview the inspectors who allegedly made the cited transactions; this request was also ignored. In the initial interview with the inspectors, they stated to the grievant they have videotape; the Union asked for this and this request was also ignored.

The Service has fatally harmed the Union's investigation by denying this extremely pertinent and relevant information. The Service has also woefully failed to detail the actions that gave rise to this removal, in that there is no reference in the NOR that the grievant in fact took anything. What they have at least alleged in writing is that possibly the grievant failed to perform the transactions the way the Service asks, but that is hardly a transgression that warrants workplace capital punishment.

In that the Service has failed miserably in establishing even a remote bit of proof of misappropriation,..."

An investigative memorandum was issued by the Inspection Service dated November 30, 2004. This report included the following relevant paragraphs:

2.  Under SIA, the Sales and Services Associates (SSAs) at the Smithtown MPO obtain stamp stock for sale to the public from a location accessible to all window clerks know as the "retail floor stock". All stamp stock and merchandise items are assigned a barcode or identification number which should be scanned or manually entered into the Point-of-Service (POS) retail terminal

-4-

by the SSA as merchandise is sold. The proper recording of sales reduces the retail floor stock inventory by the transaction amounts. SSAs retain the cash derived from sales throughout the day. At the conclusion of each business day, SSAs are required to complete a PS Form 1412, Clerk Financial Report, in which the day's receipts and disbursements are tallied to create a balanced report. The SSAs are required to turn in all cash in excess of a change fund of approximately $100.00 for which they are responsible. Each SSA maintains this change fund in a safe compartment which is solely under their control. A designated official periodically audits the floor stock as well as each SSA's cash accountability.

4.    During April and July of 2004, Postal Inspectors posing as customers made four stamp purchases in varying amounts from Chris Broderick at the Smithtown MPO. On two of these occasions SSA Broderick did not properly record the sale of the stamps into the retail terminal nor did he provide any form of customer receipt. A stamp sale correctly processed through the retail terminal generates a computerized receipt which the employee is required to provide to the customer.

5.    Analyses of SSA Broderick's daily transaction reports for the dates of these Inspection Service purchases disclosed that in both instances he recorded only a portion of the transactions. On April 22, 2004, an undercover Postal Inspector purchased one $37.00 roll of first class stamps and five $7.40 booklets of first class stamps for a total transaction of $74.00. Mr. Broderick only recorded the sale of the five stamp booklets into the POS retail terminal. He failed to record the sale of the $37.00 stamp roll.

6.    On July 29, 2004, an undercover Postal Inspector purchased three sheets of one dollar stamps valued at $20.00 each, for a total transaction of $60.00. Mr. Broderick only recorded the sale of one of these sheets, failing to enter the sale of the remaining $40.00 of these stamps into the POS retail terminal.

8.    On the morning of November 2, 2004, information was received from Smithtown Postmaster Frank Capozzoli regarding missing postal funds. He related that on the prior evening $1,100.00 was missing from the deposit at the close of business. Searching for the money and recounting the available funds had yielded negative results. The supervisor subsequently decided to examine the cash drawers of the SSAs who had worked that day. Upon opening SSA Chris Broderick's drawer, eleven $100.00

bills, totaling $1,100.00 were found.  Postal Inspectors responded to the Smithtown Post Office.

9.  Inspectors proceeded to conduct interviews of the individuals involved in the events of the previous evening: Supervisor Kirk Jablonsky, Supervisor Keith Krongel, Window Technician (T-6) Grace D'Oria, and SSA Louis Delvecchio. Broderick, and a trainee all made their final deposits at approximately 14:45. Everyone's money had been counted by Ms. D'Oria and the funds were secured in the safe. Ms. D'Oria was preparing the advance deposits shortly after 17:00 when she realized $1,100.00 were missing. She recounted the available funds and reviewed submitted paperwork but was unable to account for the missing money.

10.  Supervisors Krongel and Jablonsky, who had both left the office for the night, were notified and returned to assist. Ms. D'Oria's review of the daily paperwork revealed that SSA Chris Broderick had submitted eleven $100.00 bills as part of his final deposit.  A decision was made to inspect the cash drawers of the SSAs who had worked earlier that day, beginning with Mr. Broderick's. Supv. Jablonsky accessed the duplicate keys and in the presence of Supv. Krongel, T-6 D'Oria and SSA Delvecchio opened Mr. Broderick's cash drawer safe compartment. An audit of the cash drawer's contents was conducted by these same individuals.  Eleven $100.00 bills were discovered in the far left bill section of the drawer. Upon completion of the audit, the drawer and all of its contents were returned to the safe. A copy of PS Form 3294-C, dated 11/01/04, is attached as Exhibit 5.  Copies of the written sworn statements provided by Mr. Jablonsky, Mr. Krongel, Ms. D'Oria, and Mr. Delvecchio are attached as Exhibits 6 thru 9.

11.  Postal Inspectors and SSA Broderick conducted an audit of his cash drawer on November 2, 2004 in the presence of his APWU representative. The drawer contained $1,180.80 in cash of which $1,100.00, in the form of eleven $100.00 bills, was found in the far left bill compartment of the drawer.   Review of Mr. Broderick's final Transfer Initiation report for November 1, 2004 shows he had a total of eleven $100.00 bills in his deposit.  Factoring out this $1,100.00 from the audit total of $1,180.80 leaves a cash on-hand figure of $80.80, $19.88 short of the cash retained amount of $100.68 reported on his previous PS Form 1412.  A copy of PS Form 3294-C, dated 11/02/04, is attached as Exhibit 10.  A copy of the Transfer Initiation report, dated 11/01/04, is attached as Exhibit 11.  A copy of PS Form 1412, dated 11/01/04, is attached as Exhibit 12.

12.   Postal Inspectors interviewed SSA Broderick following the
      audit.    He stated he did not know how the missing
      $1,100.00 had gotten into his drawer.    He said he
      provided all the cash required to T-6 Grace D'Oria the
      previous day and did not notice any extra funds in his
      drawer when he secured it in the safe.    He stated he
      enters all transactions in the POS retail terminal and
      always provides customers with a receipt.  He could not
      explain his failure to properly record the sale of stamps
      and provide receipts for the purchases made by undercover
      Postal Inspectors.   the interview was terminated at Mr.
      Broderick's request.   He declined to provide a written
      statement.    A Memorandum of Interview is attached as
      Exhibit 13.

## ANALYSIS AND FINDINGS

According to the record the Smithtown New York Post Office had
experienced a shortage of more than $65000 in fiscal year 2002.
This shortage resulted in an investigation of this station by the
Postal Inspection Service.

The events involving the grievant, as recorded by the
inspectors, have been previously quoted.

The Union, at the arbitration hearing and in their closing
statement, thereafter, contended that the Service had not proven
the grievant had misappropriated postal funds.

The Union asserted the Service had also failed to provide the
grievant with rights granted under the terms of the National
Agreement since there were numerous procedural contractual
violations made by the Service.

These violations included the following violations:

The Service's failure to provide a detailed answer at step 2
of the grievance procedure and only completing PS Form 2609 by
stating "Removal is for just cause", without answering any of the

Union's allegations.

In support of this position, the Union relied on the Joint Contract Interpretation Manual (JCIM) which states at Page 104 Step 2 Decision:

> "Management must provide the union representative a written decision within ten days of the step 2 meeting...  The decision shall include (1) all relevant facts; (2) contract provisions involved,; and (3) detailed reasons for denial."

The Service's failure to do an independent review of the facts prior to issuing discipline but relying solely on the inspectors investigation and report.

The failure of the Service to provide the Union with certain requested information discussed in its step 2 appeal, including printouts of the grievant's daily transactions and copies of the videotape.

The failure of the Service to prove beyond a reasonable doubt that the grievant had misappropriated funds.  The Union claimed this was mere conjecture without proof.

The Service did not agree.  They said the Union was fully aware of the involvement of the inspectors, was present when the inspectors interviewed the grievant; had a copy of the inspection report; were told that the Service's action was not based on the videotapes, so they did not need to be turned over to them.

The Service explained there was a step 2 grievance meeting and the Union filed no objections, additions or corrections following this meeting.

The Service, through the testimony of the Smithtown Postmaster, explained that the daily transaction reports were not

available to be given to the Union since they were missing as a result of the failure of an employee to safeguard these reports.

The Service said management did not err by their reliance on the inspectors' investigative memorandum.    To support this contention the Union introduced a prior arbitration decision from Arbitrator Zumas, Case #N7M-1E-D38425/40300 (1992) who held:

"The Union's contention that the supervisor issuing the adverse actions did not make an independent investigation is without merit.   A supervisor clearly has a right to rely on the investigation of the Postal Inspection Service, the investigating arm of the Postal Service."

Other arbitrators, including this arbitrator, have issued similar rulings, especially where another investigation would bear no different fruit since no different evidence could be independently obtained.   See also Case #A98C-4A-D001118449 (2001) which held that a review of an investigative memorandum by the Service can be used to support an independent decision to issue discipline.

While each party had logical reasons for their actions and positions, this case presents a most troubling picture.

Initially one must be concerned why, if the grievant was under suspicion for possible misappropriation in April and July 2004, he was allowed to remain on the window until November.

The Service said their investigation was, during that time, continuing.   How long does one allow an investigation involving extensive financial losses, as at Smithtown, to continue without some action or a more detailed explanation of the reasons for the delay.

The purchases and sales made by the inspectors in April and July 2004 should have, admittedly, resulted in an overage in the grievant's close out balance. They did not. Receipts were not given to the inspector/customers, as required.

The grievant, during his interview with the inspector in November could not explain the events in April and July 2004. With the passage of time and the normal volume of transactions handled by window clerks such response cannot be determined to be an illogical response. One can only wonder as to what events actually happened on those days.

On November 1st when the grievant's drawer was taken from the safe and counted, one employee said he witnessed and helped count the funds which totaled $1180.75.

When the drawer was counted the following day by the grievant in the presence of the inspectors the cash was counted and totaled $1180.80.

While not a substantial difference, a difference none the less, which was not explained. Window clerks are required to account for every penny, no different from a bank teller. Any difference raises questions and puts an account out of balance.

One must also be troubled by the fact that $1100.00 in $100.00 bills was missing after having been turned in by the grievant to the closeout person. More troubling is that this exact amount and bills were found in the grievant's cash drawer.

The closeout employee testified that there was a great deal of confusion during the closeout period on November 1st. However, it

is accepted practice that no one is to have access to anyone else's cash drawer and no claim that anyone other than the grievant had access was made.

How did these bills get into his cash drawer? Another question that one can only wonder about.

Also confusing is the fact that the grievant's close out record on November 1 reflected he had retained cash of $100.68 (Joint Exhibit #3, Exhibit 10). The count of November 2, showed retained cash of $80.80. No explanation of the difference of $19.88 was offered, or from the record, investigated.

Joint Exhibit #3 Exhibit 3 also reflected financial calculations that make no sense. This document was the grievant's cash credit on April 30, 2005. It reflects a cash total of $104.95.

The Union questioned the entry on this form under pennies which was recorded as 59 equaling 5.90. In reviewing this document the only conclusion to be reached is that the totals do not and did not balance.

This form listed the following cash items:

2 $20.00 bills = $40.00

1 $ 5,00 bill  =   5.00

43 $1.00 bills =  43.00

21 quarters    =   5.25

49 dimes       =   4.90

19 nickels     =    .95

59 pennies     =   5.90

Total            = $104.95

Adding these figures results in a total of $105.00 or a five cent difference.    If the 59 pennies are counted as 59 cents the total is $99.69 or a difference of $5.26.

The only determination that can be made from these additions is that reliance on any of these numbers is suspect, at best.

Does the evidence support the removal action?    It is at best circumstantial.  While the transactions were certainly questionable and troubling, there was no proof that the grievant had taken or misappropriated the funds.

Beyond all of the financial discrepancies, the failure of the Service to be able to provide the Union with the records of the April and July transactions must be construed as harmful to a full and fair investigation.

It is beyond question that the grievant did not follow proper postal procedures.    He is responsible and accountable for the handling of his cash and drawer.  His record keeping and financial controls were lacking and he too must bear responsibility for all the inaccurate cash reports.

The totality of his acts, or failure to act, results in a determination that he cannot return to a window or cash handling position.

Since the evidence, even by a preponderance, did not uphold his removal, he is to be reinstated.  He is to receive back pay, less any other compensation received from January 15, 2005 through the implementation of this decision.    However, he is not to be

-12-

reinstated as a window clerk.  The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or such other position that does not handle cash transactions as they may determine.


September 2005                          Harry R. Gudenberg
                                              Arbitrator

REGULAR ARBITRATION PANEL
- - - - - - - - - - - - - - - - - - - - - - - - - - - )
                                                      )
In the matter of the Arbitration )    GRIEVANT: C. Broderick
                                                      )
        between                            )    POST OFFICE.Smithtown. NY
                                                      )
  UNITED STATES POSTAL SERVICE    )    USPS CASE #A00C-4A-D05055036
                                                      )    APWU CASE #78700404
        and                                    )
                                                      )
  AMERICAN POSTAL WORKERS UNION, )
  AFL-CIO                                     )
                                                      )
- - - - - - - - - - - - - - - - - - - - - - - - - - - )

BEFORE:  HARRY R. GUDENBERG, ARBITRATOR

APPEARANCES:

        For the U.S. Postal Service: Sandra L. Peets
                                     Labor Relations Specialist

                                     Carmine Palladino
                                     Mgr. Labor Relations

        For the A.P.W.U.:            Peter Coradi
                                     National Business Agent


Place of the Hearing: Hauppauge, New York

Dates of Hearing: July 17, 2006

Date of Award: July 24, 2006

Relevant Contract Provisions: Articles 16, 19

Contract Year: 2004

Type of Grievance: Disc.

AWARD: The grievant is to be returned to work at the Smithtown
       postal facility as a distribution clerk and is entitled to
       back pay and seniority credit for the reasons more fully
       discussed in the complete decision.

Arbitrator:

_____
Harry R. Gudenberg

EXHIBIT C

on December 12, 2005 the following decision was issued after two days of hearings which involved this dispute:

"For the reasons detailed in the full decision, the grievant is to be reinstated with back pay, less any other compensation received, from January 15, through the implementation of this decision . However, he is not to be reinstated as a window clerk.  The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or such other position that does not handle cash transactions as they may determine.

Jurisdiction will be retained in the event the parties request assistance in the implementation of this decision."

On October 25, 2005 the Union advocate, by letter, with a copy to the Service, advised this Arbitrator of the following:

"On October 18, 2005 I was made aware that the Postal Service instructed the Grievant Christopher Broderick that he must report to the Bethpage, NY postal facility as a part-time flexible employee with a reporting time of 7 PM.

The Grievant is a full time regular clerk, employed at the Smithtown, NY postal facility, with a reporting time of 6:45 AM.

On the above date, I spoke to Mr. Carmine Palladino, Manager, Labor Relations, Long Island District regarding this matter. I made the union's position clear that Mr. Broderick should

-2-

return to Smithtown, with the same status and same work hours."

Thereafter, several attempts were made to arrange a conference call between the advocates, Mr. Palladino, and the Arbitrator.

On November 10, 2005 a conference call was held. The parties were reminded that, in accordance with the September 12, 2005 decision they were, jointly, to attempt to locate a position suitable to the grievant, recognizing that it would take special efforts by all parties to accomplish such effort.

During this call it was suggested that the parties could attempt to find another location for the grievant to return to work but that it was not to be as a part-time flexible employee, since such a position and assignment would not provide the grievant with a daily or weekly work schedule but might subject him to less hours per day or week under the terms of the Agreement.

The parties were reminded that the facts in the initial case did not support the grievant's removal and his reinstatement was ordered since the actions the Service took were not completely supported, for the reasons discussed in the initial decision.

On January 12, 2006 the Union, by letter, with a copy to the Service, advised the Arbitrator as follows:

"On January 5, 2006 I was provided, verbally, on behalf of the Grievant, with 2 "offers". The offers are for the Grievant to be employed as a Part-Time Flexible Clerk at either the Mid-Island P&DC or Western Nassau P&DC. In either situation the Grievant would be on the night tour with only a four (4) hour

guarantee when scheduled to work.

Clearly this offer, which took two (2) months to be made is unacceptable and in conflict with your September 12, 2005 award, as well as your clarification which was articulated during the November 10, 2005 conference call.

As another point of information, despite your award which reflects the Grievant is to receive Back Pay from January 15, 2005 through the implementation of your decision no effort has been made to process the aforementioned pay."

Sometime thereafter, the Arbitration Scheduling Coordinator contacted the Arbitrator and indicated the parties had not been able to resolve their disagreements or find a suitable position for the Grievant and requested the scheduling of another hearing.

On July 17, 2006 another hearing involving the representatives from the Postal Service, the Union, and the Grievant took place before the Arbitrator.

At that time the Service advised that they had been unable to find any position for the grievant, other than a part-time flexible employee. The Service explained they had determined they had no other option in order to protect the seniority rights of other employees as provided for in Article 37 of the Agreement.

The Union took the position that the Service could have returned the Grievant to the Smithtown postal facility, as a distribution clerk, without window responsibilities. The Union said they had consistently made this recommendation to the Service but to no avail.

-4-

Extensive discussions of other options/possibilities took place but neither party was willing to consider other alternatives. The Union cited several Postal documents as well as the Joint Contract Interpretation Manual (JCIM) and asserted the Service was purposefully avoiding the implementation of the prior award.

In my prior decision, in part, (the entire decision is in the hands of the parties) the following statements were made:

"It is beyond question that the grievant did not follow proper postal procedures. He is responsible and accountable for the handling of his cash and drawer. His record keeping and financial controls were lacking and he too must bear responsibility for all the inaccurate cash reports.

The totality of his acts, or failure to act, results in a determination that he cannot return to a window or cash handling position.

Since the evidence, even by a preponderance, did not uphold his removal, he is to be reinstated. He is to receive back pay, less any other compensation received from January 15, 2005 through the implementation of this decision. However, he is not to be reinstated as a window clerk. The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or such other position that does not handle cash transactions as they may determine."

Since the parties have been unable to find a position for the grievant that they believe would have been suitable or workable, it is directed that the grievant be returned to the Smithtown postal

facility, as a distribution clerk.

According to the parties the Smithtown facility is operational during the hours of 5 AM to 7 PM. The grievant must be returned to work and assigned as a regular employee with a work schedule within the Smithtown facility hours of operation. He, in accordance with my original decision is to be credited with seniority for the period of time of the removal action.

While it is recognized that the Agreement allows for bids to window positions, the Grievant would be well advised to refrain from any such bids since his inability to handle cash transactions, in accordance with postal procedures, is what resulted in his being involved in this disciplinary action.

Discussion with the aforementioned parties also took place concerning the back pay issue.

The Grievant admitted he had received paper work from the Service requesting certain information. He explained he had not provided the data or submitted it since there was a great deal of confusion over his reinstatement and job offers and advice he had been given.

The parties were advised that the grievant should quickly provide the Service with the paperwork and data they were seeking and that the Service should, upon receipt, rapidly process their back pay obligation.

No other issues were presented for consideration of the original decision. The hearing was then concluded. This supplementary decision is being issued on this 24th day of

-6-

July 2006.

Harry R. Gudenberg
~~Arbitrator~~

**REGULAR ARBITRATION PANEL**

In the Matter of the Arbitration between

| | |
|---|---|
| UNITED STATES POSTAL SERVICE | Grievant: **Christopher Broderick** |
| and | Post Office: **Bethpage, NY** |
| AMERICAN POSTAL WORKERS UNION, | Case No: |
| AFL-CIO | **USPS #A00C1AD06253650**<br>**Union # B0317706C** |

BEFORE: Sarah Cannon Holden, Arbitrator
APPEARANCES:

      For the U. S. Postal Service: **Jim Scanna**
      For the Union: **Peter Coradi**

| | |
|---|---|
| **PLACE OF HEARING:** | Garden City, New York |
| **Date of Hearing:** | February 8 & 23, 2007 |
| **Date of Award:** | February 26, 2007 |
| **Type of Grievance:** | Removal |

      The parties agreed to bifurcate the hearing. The procedural issue was heard on February 8, 2007. A hearing on the merits was held on February 23, 2007. At the request of the parties, I issued a bench decision at the conclusion of the first day of hearing and the second hearing date was set.

**ISSUE.**

      The Union submitted the following issue for decision on the first day of hearing:

> **Is the Postal Service barred by the principles of res judicata and collateral estoppel from issuing the Notice of Removal, dated June 14, 2006 to the grievant, Christopher Broderick? If so, what is the appropriate remedy?**

      The parties agreed to the following issue heard on the second day of hearing:

> **Did the Postal Service have just cause to issue the grievant a Notice of Removal on June 14, 2006? If not, what shall be the remedy?**

---

**EXHIBIT D**

**BACKGROUND.**

     The origins of the instant grievance have their roots in a prior removal issued to the grievant by the Postal Service and the arbitration decision sustaining the grievance. The grievant was a full-time regular clerk on Tour 2 at the Smithtown Post Office when he was removed from the Service on December 8, 2004. He grieved his removal. A hearing was held before Arbitrator Harry R. Gudenberg in June and August 2005. He issued his award on September 12, 2005. He found that "the grievant is to be reinstated with back pay.... However, he is not be reinstated as a window clerk. The Service and the Union, together with the grievant, are to find placement for him as a distribution clerk or other such position that does not handle cash transactions as they may determine." Arbitrator Gudenberg retained jurisdiction "in the event the parties request assistance in the implementation of this decision."

     On October 18, 2005 a meeting of the various parties was held to discuss implementation of the Gudenberg award. The grievant testified that the Postal Service simply told him where to report and that there was no real discussion. The record shows that Carmine Palladino, Manager of Labor Relations, instructed the grievant to report to NY L&D Center in Bethpage, New York on October 20, 2005 where he was reinstated as a part-time flexible clerk on Tour 3. At the time the grievant was working another job and asked for a 6 week delay in reporting to work. The Postal Service denied the request. The grievant asked for a 2 week delay. The request was again denied. At the request of Plant Manger Daniel Healy, the grievant did submit several PS Form 3971s requesting leave.

     On November 4, 2005 the Postal Service sent the grievant a "3-Day Letter" in which the grievant was instructed to report to work immediately or show cause for his absence. He did not respond. On November 15, 2005 the Postal Service sent the grievant a "10-Day Letter" with similar instructions. The grievant was further informed that failure to respond to the letters will result in the grievant being charged with AWOL. It is this refusal that is the basis for the disciplinary action before me.

     The grievant testified that he believed that in accordance with the Gudenberg Award he should have been returned to Smithtown as a full-time clerk on Tour 2. The Union stated that it tried to work out its differences with the Postal Service. The parties,

2

however, were unable to agree and scheduled another hearing for July 17, 2006 before Arbitrator Gudenberg at which he was asked to clarify his award.

On June 14, 2006 the grievant, Christopher Broderick, was issued the Notice of Removal that is the subject of the current grievance. The charges are: <u>Continuous Absence Without Leave and Failure to Follow Instructions</u>. The effective date of the removal was Sunday, July 16, 2006, one day prior to the second hearing before Arbitrator Gudenberg.

On July 24, 2006 Arbitrator Gudenberg issued a "Supplemental Decision." He clarified his previous award stating that "(t)he grievant is to be returned to work at the Smithtown postal facility as a distribution clerk and is entitled to back pay and seniority credit for the reasons more fully discussed in the complete decision."

The Union believes that the "Supplemental Decision" should have resolved the second Notice of Removal that is the subject of the instant grievance before me.

However, the Postal Service refused to rescind the second Notice of Removal arguing that it had just cause inasmuch as the grievant refused to report to duty as directed.

The Union filed a grievance on behalf of Christopher C. Broderick challenging the Notice of Removal on both procedural and substantive grounds. The grievant testified that at Step 1 Supervisor Linda M. Moran (Bethpage) acknowledged that she was not familiar with the grievance, did not know the grievant, that the grievant did not work for her and that the two never met. The parties were unable to settle the grievance.

The grievance was presented to me for decision.

## ARGUMENTS OF THE PARTIES.

I.     Procedure

     <u>The Union.</u>

The Union argued that the Gudenberg decisions are dispositive of the issue presented by the instant grievance and that the grievant should be reinstated forthwith.

The Union argued that the first Gudenberg Award is unambiguous and that the Postal Service should have put the grievant back to work in Smithtown in the first place. It argued that the matter before me, the June 14, 2006 removal, would never have become an issue had the Postal Service complied with the Gudenberg Award.

In sum, it argued that the grievant's right to reinstatement has already been resolved; that the instant grievance is moot; and, that the grievant should be restored to a full-time position at Smithtown.

The Postal Service.

The Postal Service argued that the instant Notice of Removal is an action taken subsequent to the Gudenberg Award and is not, therefore, resolved by it. It argued that it is not up to the grievant or the Union to decide on the interpretation of an arbitration award. In addition, it argued that if the grievant disagreed with the Postal Service's action, he should have reported as directed and grieved the action. Surely, the Postal Service argued, it could not be denied the right to discipline an employee just because the parties disagreed about the interpretation of an arbitration award.

It argued that the grievant cannot be allowed to ignore oral directives or letters of inquiry just because he disagrees with management. The Postal Service asks that the grievance be heard on the merits.

II.    Merits

The Postal Service.

On the merits the Postal Service argued that the Gudenberg Award does not say that the grievant must be reinstated as a full-time employee at the Smithtown facility. It argued that a meeting was held following the issuance of the award and that while the parties could not agree on the assignment the Service did direct the grievant to report to work on October 20, 2005. Not only did he refuse to report to work, he failed to provide the Service with notice of any mitigating circumstances for his absence as requested in two letters in November 2005.

In addition the Postal Service argued that inasmuch as the Union's procedural arguments are without merit and the Service acted in accordance with its understanding of the Gudenberg Award, the grievant violated his contractual obligation to return to his assigned position. It argued further that had the grievant reported to work as instructed and then grieved this matter would have been resolved one way or another by now. Instead, he is responsible for its being dragged out.

In sum, the Postal Service argued that it had just cause to issue the grievant the

Notice of Removal on July 14, 2005.

The Union.

On the merits the Union argued that the Gudenberg award is unambiguous and that the Service is entirely responsible for the situation that developed with the grievant. It argued that there is nothing in that award to suggest that the grievant should be returned as a part-time flexible instead of the full time clerk that he had been. Furthermore, it argued that there was no question that the grievant was supposed to be returned to Smithtown and not Bethpage.

In addition it argued that the testimony provided by the grievant must be taken as the truth inasmuch as the Service presented no witnesses at the hearing. The grievant testified that he never received any papers telling him what his assignment was or where it was. The Union argued that management at Bethpage was not aware that the grievant was supposed to report to that facility. It contended that the grievant submitted the Forms 3971s to Plant Manager Daniel Healy at his request and with the understanding that the signed forms would be returned to him (the grievant). None was ever signed by management or returned to the grievant.

Furthermore the Union argued that it is clear that the Service was not treating the grievant fairly inasmuch as it established Sunday as the effective date of the instant dismissal. Not only is Sunday never used as an effective date of dismissal, it was also the day before the scheduled date of the second hearing with Arbitrator Gudenberg. The Union argued that these dates were not coincidental.

Finally, the Union argued that the second Gudenberg award confirmed that it and the grievant had been correct in their interpretation. Thus, it argued, the Service did not have just cause to issue the grievant the Notice of Removal.


**DISCUSSION and AWARD.**


Procedural Issue

I find that the Union's argument that Arbitrator Gudenberg's July 24, 2006 "Supplemental Award" is dispositve of the instant grievance is without merit. I find that it is not up to the grievant and/or the Union to act unilaterally upon its determination that

the Service's interpretation was incorrect. Arbitrator Gudenberg made it clear that the parties were to work out the grievant's new assignment. When they could not agree they should have returned to the arbitrator. They did not. And the grievant did not report to work as instructed. It is the act of not following management's instructions that is the subject of the instant grievance; the issue is not whether the instructions were in compliance with the Gudenberg award. The Service's charges that the grievant was AWOL and that he failed to follow instructions were not at any time a matter before Arbitrator Gudenberg and were not, therefore, resolved by his "Supplemental Award". They are the charges before me and I find that they are issues subsequent to and, therefore, separate from the issue raised in the grievance before Arbitrator Gudenberg. Thus, the principles of res judicata and collateral estoppel do not apply.

Therefore, I find that the Union's procedural argument is without merit. I shall turn now to the merits of the grievance before me.

Merits

The parties agree on the basic facts of this grievance. I find that the facts suggest a series of mistakes were made which led finally to the discipline issued to the grievant. The parties did not engage in an effective or cooperative effort to implement Arbitrator Gudenberg's award. Rather than request an immediate clarification of the award, the Service instructed the grievant to report to a part-time flexible position in Bethpage. The communications between Bethpage management and the grievant suggest that the Service did not formally notify management at Bethpage of the grievant's new assignment.

The grievant claimed that he did not report to Bethpage because the assignment ignored Arbitrator Gudenberg's award. On the other hand the evidence and testimony were that the grievant twice requested, from Bethpage management, a delay in reporting to his new assignment. He did not grieve the assignment; he merely did not show up to work when management refused to comply with his requests. Arbitrator Gudenberg retained jurisdiction in the case that the parties had difficulty implementing his award. Neither party made such a request until months after the grievant was directed to report to Bethpage. By that time the grievant had been issued the instant Notice of Removal for being AWOL and for not following instructions.

Arbitrator Gudenberg's "Supplemental Award" clarifies his original award. He

6

directs that "(t)he grievant is to be returned to work at the Smithtown postal facility as a distribution clerk and is entitled to back pay and seniority credit for the reasons more fully discussed in the complete decision."

Thus, it turns out that the grievant should not have been assigned to a part-time flexible position at Bethpage. That was the Service's error. It is also true, however, that the grievant made an error. Had the grievant reported as instructed and filed a grievance in a timely fashion this matter could have been resolved months ago. The accepted practice is to obey an order in the moment and then grieve it. Obey now, grieve later. The grievant failed to follow the accepted practice and he failed to report for his assigned tour.

The question then becomes whether the Postal Service had just cause to remove the grievant as a result of the above-outlined circumstances. I find that when all the facts are weighed the removal of the grievant is not justified.

THEREFORE, I award as follows:

**PROCEDURE:** I find that the Postal Service is not barred by the principles of res judicata and collateral estoppel from issuing the June 13, 2006 Notice of Removal to Christopher Broderick.

**MERITS:** I find that the Postal Service did not have just cause to issue the June 13, 2006 Notice of Removal to Christopher Broderick. The grievant shall be reinstated in accordance with the findings of the July 24, 2006 Gudenberg Supplementary Award. There shall be no award of back pay associated with the instant grievance.

Sarah Cannon Holden

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN POSTAL WORKERS UNION,          )
AFL-CIO,                                )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )     Civil No. 07-0178 (RMC)
                                        )
UNITED STATES POSTAL SERVICE,           )
                                        )
            Defendant.                  )
_____)

### ORDER

Upon consideration of Defendant's Motion to Dismiss; Plaintiff's opposition thereto;

Plaintiff's Motion for Summary Judgment and the entire record herein, it is this _____ day of

_____, 200___, hereby

**ORDERED** that Defendant's Motion to Dismiss is **DENIED**, and Plaintiff's Motion for

Summary Judgment is **GRANTED** and  Arbitrator Gudenberg's awards are hereby

**ENFORCED**.  Defendant must comply with Arbitrator Gudenberg's orders.

_____
United States District Court Judge

Copies to:

Brenda C. Zwack
bzwack@odsalaw.com

Michelle Johnson
Michelle.Johnson@usdoj.gov

---

**ATTACHMENT 2**